1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEBRASKA

2

3   UNITED STATES OF AMERICA,   )  CASE NO.  8:11CR106
                          )

4              Plaintiff,   )
                          )

5   vs.                    )  Omaha, Nebraska
                          )  July 20, 2011

6   JOHN MASS,            )  9:04 a.m.
                          )

7              Defendant.   )

8

9

10           TRANSCRIPT OF MOTION HEARING PROCEEDINGS

11        BEFORE THE HONORABLE THOMAS D. THALKEN
             UNITED STATES MAGISTRATE JUDGE

12

13

14

15   APPEARANCES:

16   For the Plaintiff:        NANCY A. SVOBODA
                         U.S. Attorney's Office -

17                           Omaha
                         1620 Dodge Street

18                         Suite 1400
                         Omaha, Nebraska  68102

19

   For the Defendant:        JAMES K. McGOUGH

20                         McGough Law Firm
                         11920 Burt Street

21                         Suite 100
                         P. O. Box 540186

22                         Omaha, Nebraska 68154

23

24

25   Proceedings recorded by electronic sound recording,
   transcript produced by transcription service

2

1              (Whereupon, at 9:04 a.m., the following proceedings
2    were had in open court:)
3              THE COURT:  We're on the record in United States
4    versus John Mass, carrying the number of 8:11CR106.
5              Counsel, enter their appearance for the record,
6    please.
7              MS. SVOBODA:  Good morning, Your Honor.  Nancy
8    Svoboda on behalf of the United States.  At counsel table with
9    me, Judge, is Clay Nolte, special agent of ATF.
10             MR. McGOUGH:  Good morning, Judge.  Jim McGough with
11   Mr. Mass.
12             THE COURT:  All right.  We're here on the defendant's
13   various motions.  First, we have a motion to dismiss, Filing
14   Number 42.  We have the motion to sever, Filing Number 44, and
15   we have the motion to suppress, 46.  I would propose we just do
16   an omnibus evidentiary hearing rather than try to go at them
17   separately since they're somewhat intertwined.
18             With that in mind, Mr. McGough, do you wish to make
19   an opening statement with regard to any of them?
20             MR. McGOUGH:  No, Your Honor.
21             THE COURT:  All right.
22             Miss Svoboda?
23             MS. SVOBODA:  Same, Judge.  No opening statement.
24             THE COURT:  Very well.
25             And then we'll proceed and, Miss Svoboda, I guess -

Wayne M. Lovett - Direct (Ms. Svoboda)                                          3

1   well, we'll proceed with the evidence in the matter.

2            Miss Svoboda?

3            MS. SVOBODA:  Judge, what I'd like to do is address

4   Mr. Mass' motion to suppress first and reason being, Judge, is

5   because I've lined people up to be here for that.  I -- the way

6   --

7            THE COURT:  Very well.

8            MS. SVOBODA:  -- I read these, Judge, is that's the

9   only motion that I submit I need to put evidence on.  The other

10  one's more argument.  So if I may.

11           THE COURT:  Very well.

12           MS. SVOBODA:  Thank you.

13           Judge, I call Wayne Lovett to the stand.

14           And we - Judge - we - Mr. McGough and I are self --

15           THE COURT:  Sequestration?

16           MS. SVOBODA:  Sequestration, yes, thank you.

17           THE COURT:  All right.  All witnesses are sequestered

18  then, both prosecution and defense.

19           WAYNE M. LOVETT, PLAINTIFF'S WITNESS, SWORN

20           THE COURT:  You may inquire.

21           MS. SVOBODA:  Thank you.

22                        DIRECT EXAMINATION

23  BY MS. SVOBODA:

24  Q.  Morning, sir.

25  A.  Morning.

Wayne M. Lovett - Direct (Ms. Svoboda)                                    4

1    Q.   Would you mind stating your name one more time?

2    A.   Wayne M. Lovett.

3    Q.   And are you employed, sir?

4    A.   Yes, ma'am.

5    Q.   By whom?

6    A.   Douglas County Department of Corrections.

7    Q.   How long have you been with the Department?

8    A.   Nine years.

9    Q.   And what is your current position, sir, or title?

10   A.   Admissions manager.

11   Q.   How long have you held that position or title?

12   A.   Three years.

13   Q.   Sir, what are your duties and responsibilities as the

14   admissions manager for Douglas County Corrections?

15   A.   I oversee all the processes for intake and release of

16   inmates from the facility as well as the classifications for

17   proper housing.

18   Q.   Okay.  Have you had prior positions with the Douglas County

19   Corrections?

20   A.   Yes, ma'am.

21   Q.   What are those?

22   A.   I was a correctional officer 2 working in the booking

23   department.

24   Q.   Correction officer 2?  Any other positions with Douglas

25   County Corrections?

Wayne M. Lovett - Direct (Ms. Svoboda)                                    5

1   A.   Correctional officer 1.

2   Q.   What's the difference, Mr. Lovett?

3   A.   It's just a promotion similar to like military --

4   Q.   Okay.

5   A.   -- moving up a stripe.

6   Q.   Okay.  What were your duties and responsibilities as a

7   correctional officer 1 and 2?

8   A.   I was - we were usually working housing units --

9   Q.   Okay.

10  A.   -- and sorting inmates.

11  Q.   What's a housing unit?

12  A.   It's where we house inmates.  Sometimes they're referred to

13  as pods, module units.

14  Q.   Okay.

15  A.   We call them a housing unit here.

16  Q.   Okay.  You've used another couple words I'd like to talk to

17  you about.  When you were describing your job description as

18  the admissions manager, I think you used the word "intake," and

19  then later on you used the word "booking."  What do you mean by

20  those two words, sir?

21  A.   Well, you know, the process is, you know, we're taking in

22  inmates and releasing them.  But we're also the central booking

23  for Douglas County.  So for all law enforcement agencies, they

24  want to, you know, file a complaint for new charges or process

25  warrants, they come through our department.

PDF created with pdfFactory trial version www.pdffactory.com

Wayne M. Lovett - Direct (Ms. Svoboda)                                    6

1   Q.  That's --

2   A.  We book the charges which then get sent to the prosecutors

3   for filing.

4   Q.  All right.  As Admissions manager, your job is to see that

5   Douglas County Corrections policies pertaining to the bringing

6   in and the releasing of inmates are followed.  Correct?

7   A.  Yes, ma'am.

8   Q.  Do you personally admit or book a person in, Mr. Lovett?

9   A.  No, ma'am.

10  Q.  But do people that work for you perform that task?

11  A.  Yes, ma'am.

12  Q.  Are there certain - are there certain records or notations

13  or pieces of paper that are generated every time an inmate is

14  booked in?

15  A.  Yes, ma'am.

16  Q.  Will you give me an example of what is always generated.

17  A.  The receipts for property.  We got two receipts, one for

18  personal property and then one for clothing.

19  Q.  Now, what's the purpose of that?

20  A.  Well, we separate the personal property because that can be

21  released and, you know, as far as monies, wallet, ID's, cell

22  phones, because they can release that to their family if need

23  be.  We have emergency key release within the first 24 hours.

24  But clothing items can't be released unless they get sentenced

25  to a federal or a State penitentiary.

Wayne M. Lovett - Direct (Ms. Svoboda)                    7

1  Q.  Okay.  And when the - is it the person who's making that
2  receipt with the new inmate, is that person contemporaneously
3  with talking to the inmate about the clothing receipt making
4  the notations on the clothing receipt?
5  A.  Yes, ma'am.
6  Q.  Sir, once a clothing receipt - I'm going to stay with that.
7  Once a clothing receipt is made, where is the original of that
8  kept?
9  A.  The original is kept in the inmate folder.
10 Q.  And the inmate folder is maintained in your department,
11 sir?
12 A.  Yes, ma'am.
13 Q.  And those are records that are kept in the regular course
14 of business of Douglas County Corrections.  Correct?
15 A.  Yes, ma'am.
16 Q.  Sir, is - are you familiar with something called a rules
17 and regulation handbook put out by Douglas County Corrections?
18 A.  Yes, ma'am.
19 Q.  What is that, sir?
20 A.  It's rules to cover the facility for an inmate so that they
21 understand what we expect of them.  It also gives them a list
22 of types of services, internal discipline.  There's penalties
23 for certain things such as contraband, fighting.  And so it
24 gives them the - lays out the rules as far as what the
25 penalties are for those infractions, you know, how to use the

Wayne M. Lovett - Direct (Ms. Svoboda)                              8

1    phone, how to access programs, classes.  So it has a variety of

2    stuff in there that helps the inmate understand the business of

3    a jail.

4    Q.  Thank you.

5         MS. SVOBODA:  Your Honor, may I approach the witness,

6    please?

7         THE COURT:  You may.

8    BY MS. SVOBODA:

9    Q.  Mr. Lovett, I've placed a few exhibits in front of you.

10   First of all, sir, I've placed in front of you Exhibit Number

11   2.  Would you bring that into your view, please?

12   A.  (Witness complies)

13   Q.  Can you identify Exhibit Number 2, and, if you can, would

14   you please do so?

15   A.  Yes, ma'am.  It's the corrections clothing property

16   receipt.

17   Q.  Is this a true and accurate copy of such receipt maintained

18   in Mr. Mass' file at Douglas County Corrections?

19   A.  Yes, ma'am.

20   Q.  And Exhibit Number 3, sir.  Can you identify that, and, if

21   you can, would you please do so?

22   A.  Yes, this is the corrections personal property receipt.

23   Q.  And is this a true and correct copy of the - such receipt

24   maintained in Mr. Mass' file with the Douglas County

25   Corrections?

Wayne M. Lovett - Direct (Ms. Svoboda)                          9

1   A.  Yes, ma'am.
2   Q.  Mr. Lovett, I've also placed in front of you Exhibit Number
3   1.  Can you identify that, and, if you can, would you please do
4   so?
5   A.  Yes, this is the inmate handbook that outlines the policies
6   and procedures for Douglas County Corrections.
7   Q.  Sir, this front page of the handbook says revised 2010.  If
8   - well --
9           MS. SVOBODA:  Your Honor, at this point, I'd offer
10  into - no.  I strike that.  Excuse me.
11  BY MS. SVOBODA:
12  Q.  Sir, is this the handbook - this revision of the handbook,
13  is this the one that would have been given to Mr. Mass if he
14  came into the Douglas County correctional facility in April of
15  2011?
16  A.  Yes, ma'am.
17          MS. SVOBODA:  Your Honor, at this point, I'd offer
18  Exhibits 1, 2, and 3 into evidence.
19          THE COURT:  Any objection?
20          MR. THOMAS:  No, Your Honor.
21          THE COURT:  Exhibits 1, 2, and 3 will be received.
22          MS. SVOBODA:  Thank you.
23          May I approach one more time, Your Honor?
24          THE COURT:  You may.
25  BY MS. SVOBODA:

Wayne M. Lovett - Direct (Ms. Svoboda)                                    10

1   Q.  Mr. Lovett, I've placed in front of you Exhibit Number 4.

2   Can you identify that, and, if you can, would you please do so?

3   A.  Yes, ma'am.  This is the standard sign that is on every

4   inmate telephone within the facility.  It's both in English and

5   in Spanish.

6   Q.  Did you take that photograph, sir?

7   A.  Yes, ma'am.

8   Q.  Did you send that to me yesterday by way of email?

9   A.  Yes, ma'am.

10  Q.  Where in the correctional facility is that sign that you

11  took the picture of?

12  A.  This specific sign is in Admissions.

13  Q.  And where is Admissions?

14  A.  That's where we process everyone that's coming in --

15  Q.  Okay.

16  A.  -- so we can get them - to get their property inventory,

17  get them dressed, get them classified.  They see medical.

18  Q.  It's where the person first comes into the correctional

19  facility.  Correct?

20  A.  Yes, ma'am.

21  Q.  Is that a true and accurate representation of the sign you

22  took a picture of yesterday?

23  A.  Yes, ma'am.

24          MS. SVOBODA:  Your Honor, I'd offer Exhibit Number 4

25  into evidence.

Wayne M. Lovett - Cross (Mr. McGough)                    11

1            THE COURT:  Any objection?

2            MR. THOMAS:  No.

3            THE COURT:  Exhibit 4 will be received.

4    BY MS. SVOBODA:

5    Q.  You say that sign is around or above or around every phone

6    that an inmate uses in the correctional facility?

7    A.  Yes, ma'am.

8    Q.  Is such a - was such a sign around those phones in April of

9    2011?

10   A.  Yes, ma'am.

11   Q.  Thank you, Mr. Lovett.

12           MS. SVOBODA:  Judge, I have no other questions for

13   Mr. Lovett.

14           THE COURT:  Mr. McGough, cross?

15           MR. McGOUGH:  Thank you, Judge.

16                       CROSS-EXAMINATION

17   BY MR. McGOUGH:

18   Q.  Mr. Lovett, you've got Exhibits Number 2 and 3 in front of

19   you there?

20   A.  Yes, sir.

21   Q.  Okay.  And you indicated that both of those Exhibits Number

22   2 and 3 are both maintained in Mr. Mass' file.  Correct?

23   A.  Yes, sir.

24   Q.  You didn't personally observe any individual sign either

25   Exhibit Number 2 or Exhibit Number 3, did you?

Wayne M. Lovett - Cross (Mr. McGough)                         12

1    A.  No, sir.

2    Q.  That's left up to another officer?

3    A.  Yes.

4    Q.  Do you know if Exhibit Number 2 and Exhibit Number 3 were

5    signed by the same individual?

6            MS. SVOBODA:  Forgive me, Your Honor.  I just want to

7    make sure the sequestration order is still in effect?  May I

8    address someone in the back of the room?

9            MR. McGOUGH:  Yes, he's a lawyer with my office.

10           MS. SVOBODA:  Okay.  Thank you, Judge.

11           Sorry to interrupt, Mr. McGough.

12           MR. McGOUGH:  That's okay.

13   A.  As far as the witnessing officer, they are different

14   because personal property and clothing are done by different

15   people.

16   BY MR. McGOUGH:

17   Q.  Okay.  But the - it says at the - about halfway down the

18   page it's got a line for date, inmate name, witnessing officer.

19   Do you see that?

20   A.  Yes, I do.

21   Q.  And then the individual that signs this puts the date.

22   Yes?

23   A.  Yes, sir.

24   Q.  And then the inmate purportedly signs this form.  Right?

25   A.  Yes, sir.

Wayne M. Lovett - Cross (Mr. McGough)                    13

1   Q.  Does it appear that Exhibits Number 2 and Exhibits Number 3

2   were signed by the same inmate?

3   A.  Yes, sir.

4   Q.  Okay.  You believe that those signatures are similar?

5   A.  Yes, sir.

6   Q.  But you didn't witness who signed what form.

7   A.  No, sir.

8   Q.  Okay.  Regarding Exhibit Number 4, you said that this

9   particular photograph was taken from some sign that was placed

10  on the call - on the phone in Admissions.  Right?

11  A.  Yes, sir.

12  Q.  The recorded conversations that the Government has that are

13  alleged to have been conversations from Mr. Mass, do you know

14  what phones were used in those conversations?

15  A.  No, sir.

16  Q.  So you don't know whether or not he used the Admissions

17  phone when he placed those calls?

18  A.  No, sir.

19  Q.  These - this sign demonstrated on Exhibit Number 4, where

20  is that placed on the phone?

21  A.  It's actually within the phone.  It's a large metal phone

22  with the receiver in the middle and the sign is embedded inside

23  each phone.

24  Q.  It's - is the writing on the phone - or the writing on the

25  sign, is it exposed?

Wayne M. Lovett - Cross (Mr. McGough)                                    14

1   A.  Yes, sir.

2   Q.  Can somebody write over it or grafitti over it?

3   A.  No, sir.

4   Q.  Why not?

5   A.  It's got a clear plastic covering.

6   Q.  And is that clear plastic covering accessible or do you

7   need some --

8   A.  No, sir.

9   Q.  Do you need some kind of key to get to that?

10  A.  Yes, sir.  You need a special tool to be able to take the

11  phone apart to actually access the compartment.

12  Q.  Is there some type of maintenance check to make sure that

13  these signs are on each of the phones that are available to the

14  inmates?

15  A.  Yes, sir, that's part of the housing unit officer's

16  responsibility each shift three times a day.

17  Q.  And do you have any records that demonstrate whether or not

18  such checks were made in April of 2011?

19  A.  We do, but I don't have them with me.

20  Q.  So you can't - well, let me ask you this way:  Do you have

21  any information as you sit here today that this placecard was

22  on the particular phone that Mr. Mass used?

23  A.  No, sir.

24  Q.  Okay.

25          MR. McGOUGH:  Nothing further.

Mary T. Synowiecki - Direct (Ms. Svoboda)                    15

1           THE COURT:  Redirect?

2           MS. SVOBODA:  None, Your Honor.

3           THE COURT:  May the witness be excused?

4           MS. SVOBODA:  Please.

5           MR. McGOUGH:  Yes, Your Honor.

6           THE COURT:  You are excused as a witness.

7           THE WITNESS:  Thank you.

8           THE COURT:  You can hand the exhibits to the clerk as

9   you pass.

10          THE WITNESS:  Okay.

11          MS. SVOBODA:  Judge, may I step outside the courtroom

12  to see if my next --

13          THE COURT:  You may.

14          MS. SVOBODA:  -- witness is out there?

15              (Witness is retrieved.)

16          MS. SVOBODA:  Judge, I'm calling Mary Synowiecki to

17  the stand.

18          MARY T. SYNOWIECKI, PLAINTIFF'S WITNESS, SWORN

19          THE COURT:  Pull that a little closer and bring the

20  mike to you, please.  Thank you.

21          You may inquire.

22          MS. SVOBODA:  Thank you.

23                      DIRECT EXAMINATION

24  BY MS. SVOBODA:

25  Q.  Morning, ma'am.  You are wearing a rather distinctive

Mary T. Synowiecki - Direct (Ms. Svoboda)                    16

1    uniform.  Are you employed by the Sarpy County Sheriff's

2    Department?

3    A.  I am.

4    Q.  How long have you been with the Sarpy County sheriff?

5    A.  Twelve years.

6    Q.  And to what unit are you currently assigned with the

7    Sheriff's Department?

8    A.  The warrants and extradition unit.

9    Q.  And do you work with a group of men and women known as the

10   Metro Area Fugitive Task Force?

11   A.  Yes.

12   Q.  And, Deputy, that's a group of law enforcement officers

13   from all around what we call the Metro area.  Correct?

14   A.  Correct.

15   Q.  What are your - very generally, what are your duties and

16   responsibilities as a deputy working with the Metro Area

17   Fugitive Task Force?

18   A.  To research, locate, and apprehend wanted fugitives.

19   Q.  You would do that, ma'am, with fugitives that are out on

20   warrants issued by this court, a federal court?  Correct?

21   A.  Correct.

22   Q.  And, ma'am, do you also conduct those duties regarding

23   warrants issued by State and local law - State and local

24   authorities?

25   A.  Yes.

PDF created with pdfFactory trial version www.pdffactory.com

Mary T. Synowiecki - Direct (Ms. Svoboda)                    17

1   Q.  I would like to direct your attention to April 1, 2011.

2   Ultimately on that day, Deputy, were you in an area where John

3   Mass was arrested and brought into custody?

4   A.  I was.

5   Q.  Okay.  Ma'am, did that take place at a residence here in

6   Omaha with an address of 1616 Spring Street?

7   A.  I believe so.

8   Q.  And when you were there, were you dressed similarly as you

9   are today?

10  A.  Yes.

11  Q.  Okay.  Is that how you always conduct your duties on this

12  task force, ma'am?

13  A.  Correct.

14  Q.  In uniform?  Of course, you're armed.

15  A.  Correct.

16  Q.  Okay.  On April 1st when Mr. Mass was arrested - first of

17  all, did you participate in his arrest?  And by that, I mean,

18  Deputy, actually hands on him, perhaps put the handcuffs on

19  him?

20  A.  I did not.

21  Q.  Did you see that occur?

22  A.  I did.

23  Q.  Where did you see that occur?

24  A.  In front of the garage area of the residence which was just

25  off to the east side of the main home.

PDF created with pdfFactory trial version www.pdffactory.com

Mary T. Synowiecki - Direct (Ms. Svoboda)                          18

1   Q.  And the garage is on the front of the house?

2   A.  It sits in line equal with it.  It rests just to the east

3   side.

4   Q.  In line equal with the front door.

5   A.  Correct.

6   Q.  Okay.

7   A.  Approximate, yes.

8   Q.  Okay.  And where were you in relation to this arrest taking

9   place in the driveway?

10  A.  On the east side of the garage.  I and my partner were.  We

11  had parked on 16th Street - at the corner of 16th and Spring

12  and ran through a field and approached from the east side.

13  Q.  Is the house on a corner lot?

14  A.  Next to a corner lot.

15  Q.  Next to a corner lot.

16  A.  Vacant - empty lot.

17  Q.  Empty lot on the corner and then 1616 Spring Street.

18  A.  Correct, correct.

19  Q.  Ma'am, what street runs in front of the house at 1616

20  Spring?

21  A.  Spring Street does.

22  Q.  Okay.  After you see Mr. Mass be taken into custody, what

23  do you do next?

24  A.  Had moved from the - outside the garage area over into the

25  driveway area.

PDF created with pdfFactory trial version www.pdffactory.com

Mary T. Synowiecki - Direct (Ms. Svoboda)                               19

1   Q.  Okay.  Did you have any contact with anyone?

2   A.  With all the officers and was just observing other officers

3   who had contact with an older female.

4   Q.  Was that older female ultimately determined to be Charlotte

5   Gibson?

6   A.  I believe so.

7   Q.  Well, was it, Deputy?

8   A.  Yes, yes, it was.

9   Q.  Thank you.  And ultimately did you and other officers find

10  out that Mrs. Gibson is John Mass' mother?

11  A.  Yes, yes.

12  Q.  Deputy, did you have any conversation with Mrs. Gibson?

13  A.  I did not.

14  Q.  You did not.  Did you hear any other officers have

15  conversation with Mrs. Gibson?

16  A.  I did.

17  Q.  I'll get to that in a minute.  Deputy, after Mrs. - sorry.

18  After Mr. Mass' arrest, John Mass' arrest, did you ever go into

19  the house at 1616 Spring Street?

20  A.  I did not.

21  Q.  And did you ever have any face-to-face conversation with

22  Mr. Mass?

23  A.  I did not.

24  Q.  All right.  Now, I'm back to I asked you the question of

25  did you hear any other officers have conversation with Mrs.

Mary T. Synowiecki - Direct (Ms. Svoboda)                    20

1   Gibson and you said yes.  Correct?

2   A.  Correct.

3   Q.  Which other officers, if any, did you hear speak to Mrs.

4   Gibson?

5   A.  Officer Jeff Gassaway.

6   Q.  Ma'am, he's with Omaha Police Department.  Correct?

7   A.  Correct.

8   Q.  And he is on the same fugitive task force with you.

9   Correct?

10  A.  Correct.

11  Q.  Obviously working with you that day.  Correct?

12  A.  Correct.

13  Q.  Deputy, did you hear any other officers have any

14  conversation with Mrs. Gibson?

15  A.  Yes.  I believe Officer Shada did.

16  Q.  Just for the record, S H A D A?

17  A.  Correct.

18  Q.  And what's Officer Shada's first name?

19  A.  Jeff.

20  Q.  Jeff.

21  A.  Officer Jeff Shada.

22  Q.  Okay.  Where are you when you hear Officer Gassaway speak

23  with Mrs. Gibson?

24  A.  I was in the driveway closer to the home.

25  Q.  And where is Officer Gassaway when he is speaking with Mrs.

Mary T. Synowiecki - Direct (Ms. Svoboda)                    21

1    Gibson?

2    A.  He's on the east side of the house which would be in

3    between the garage and the house speaking with Mrs. Gibson as

4    well as the other officers that were in the area.

5    Q.  Okay.  I still gotta get my picture down here, Deputy.

6    Okay.  So driveway is - driveway/garage is on the east or west

7    side of the house?

8    A.  East.

9    Q.  Okay.  Then the house.  So as - if you're looking at 1616

10   Spring Street face forward - I'm looking at the front of the

11   house.  The driveway's on the right, and the garage is on the

12   right.

13   A.  Correct.

14   Q.  Okay.  And I'm sorry, ma'am.  Where did you say Officer

15   Gassaway was when he was speaking with Mrs. Gibson?

16   A.  He was on the east side of the house.  There's a side door,

17   if I recall correct, with a concrete patio stoop area.  And

18   some of the officers were standing in that general area

19   speaking with Mrs. Gibson.

20   Q.  Is the garage attached?

21   A.  It's detached.

22   Q.  Okay.  About what time of day is it when you are at the

23   Mass - or at Mr. Mass' property and you see him arrested?

24   A.  I believe late morning, but I'm not positive on that.

25   Q.  Okay.  How is Officer Gassaway dressed on this day when you

PDF created with pdfFactory trial version www.pdffactory.com

Mary T. Synowiecki - Direct (Ms. Svoboda)                    22

1   see him speaking to Mrs. Gibson?

2   A.   In his daily uniform displaying his badge and we had our

3   safety covers on as well that displays we're law enforcement

4   officers.

5   Q.   Is a safety cover - do you sometimes refer to that as a

6   vest?

7   A.   Correct.

8   Q.   And when you say a daily uniform, does Officer Gassaway's

9   daily uniform look like yours?

10  A.   Not directly what I have on today.  BDU pants and shirts

11  with markings for our appropriate agency or the fugitive task

12  force.

13  Q.   And did you see that he was armed that day?

14  A.   I did.

15  Q.   And is his weapon exposed --

16  A.   Yes, it is.

17  Q.   -- somewhere on his body?

18  A.   Yes.

19  Q.   What, if anything, do you hear Mr. - excuse me, Officer

20  Gassaway say to Mrs. Gibson?

21  A.   I recall him requesting consent to come in and search the

22  residence.

23  Q.   Okay.  I'm going to stop you right there.  How did Officer

24  Gassaway request consent to search the residence?

25              MR. McGOUGH:   Objection.  Hearsay.

PDF created with pdfFactory trial version www.pdffactory.com

Mary T. Synowiecki - Direct (Ms. Svoboda)                    23

1              THE COURT:  Overruled.

2    A.  I don't recall his exact words.

3    BY MS. SVOBODA:

4    Q.  Then how - then how is it, Deputy, that you say I recall

5    him requesting consent?

6    A.  I do recall him asking consent to come in.

7    Q.  All right.  Just a second.  Deputy, do you hear Mrs. Gibson

8    respond to that request?

9    A.  Yes, I did.

10   Q.  What, if anything, did you hear her say?

11             MR. McGOUGH:  Objection.   Hearsay.

12             THE COURT:  Overruled.

13   A.  Yes.

14   BY MS. SVOBODA:

15   Q.  Then, ma'am, did you hear Officer Gassaway say anything

16   else to Mrs. Gibson?

17   A.  I recall them conversing about the safety of her dogs she

18   was concerned about.  She didn't want her dogs to be harmed.

19   Q.  Okay.  Ma'am, have you seen any dogs or heard any dogs at

20   the property up to this point?

21   A.  Yes, yes.

22   Q.  How many?

23   A.  I believe there were two.

24   Q.  Two?

25   A.  But I'm not positive.

PDF created with pdfFactory trial version www.pdffactory.com

Mary T. Synowiecki - Direct (Ms. Svoboda)                          24

1   Q.   Okay.   And where are they, Deputy, if you recall?

2   A.   They had been running in the general area of the front of

3   the house and back to the east side of the house, and Mrs.

4   Gibson was just concerned for their safety and was trying to

5   keep control of them.

6   Q.   There are dogs running around the property while all you

7   officers are there?

8   A.   Yes.   They were friendly.

9   Q.   Okay.

10  A.   There was no problem from them.

11  Q.   Did you hear Officer Gassaway speak to Mrs. Gibson about

12  the dogs, about they would be taken care of or not harmed?

13  A.   I do recall him mentioning something to the effect that

14  they wouldn't - their safety wasn't an issue --

15  Q.   Okay.

16  A.   -- that they would be taken care of.

17  Q.   Did you hear Officer Gassaway speak to Mrs. Gibson about

18  anything else while you guys are in that position that you've

19  described?

20  A.   I recall Mrs. Gibson - after Officer Gassaway had spoken

21  with Mrs. Gibson for consent to come in and search the

22  residence, Mrs. Gibson wanted to come in and be present and

23  walk through.

24  Q.   Did you hear Officer Gassaway respond to that concern of

25  Mrs. Gibson's?

1  A.  I did.  I don't recall exactly what he said, but I don't

2  recall it being an issue.  I recall her going in with the

3  officers that entered into the residence.

4  Q.  I know I asked you this, but did you go into the residence

5  too?

6  A.  I did not.

7  Q.  Okay.

8  A.  I did not.

9  Q.  Okay.  Still in this conversation between Mrs. Gibson and

10  Officer Gassaway.  Do you recall those two talking about

11  anything else?

12  A.  No, I don't.

13  Q.  Do you ever recall Mrs. Gibson having - or questioning

14  Officer Gassaway about why he believed he needed to go in the

15  basement?

16  A.  No, I'm sorry, I don't.

17  Q.  Okay.

18  A.  I don't recall their exact conversation.

19  Q.  Okay.  Do you - I'll put it this way:  While Officer

20  Gassaway and Mrs. Gibson are in this conversation, do any other

21  offi - do you hear any other officers address either Officer

22  Gassaway or Mrs. Gibson?

23  A.  I believe Officer Sue Rupp did.  She was on her phone and

24  speaking with them, but I'm not clear what their conversation

25  was.

PDF created with pdfFactory trial version www.pdffactory.com

Mary T. Synowiecki - Direct (Ms. Svoboda)                    26

1   Q.  But you rec - your testimony is that you recall Officer

2   Rupp somehow being involved at some point in the conversation.

3   A.  I do.

4   Q.  All right.  Any other officers you recall having any

5   conversation with either Officer Gassaway or Mrs. Gibson while

6   they're at - while we're at this point in the encounter?

7   A.  Officer Tony - or Anthony Friend.

8   Q.  What, if any - where was Officer Friend?

9   A.  He was standing in front of me closer to the concrete area

10  that Officer Shada, Officer Rupp and Officer Gassaway were at

11  speaking with Mrs. Gibson.

12  Q.  Again, I gotta get my bearings here.

13  A.  That's okay.

14  Q.  Concrete area is different than the stoop you referred to.

15  Correct?

16  A.  It wasn't a flat walkout.  It was raised.

17  Q.  Okay.

18  A.  Concrete area, if I recall correct, like a small patio

19  stoop area.

20  Q.  Okay.  So it's not just big enough for maybe one person to

21  walk down a couple of steps.  It's maybe bigger than that.

22  A.  Correct, correct.

23  Q.  Kind of like a - did you just say a patio?

24  A.  Correct.

25  Q.  Are all these officers on the patio?

PDF created with pdfFactory trial version www.pdffactory.com

Mary T. Synowiecki - Direct (Ms. Svoboda)                    27

1    A.  Officer Friend at one point, as I said, was standing in

2    front of me.  I recall seeing Officer Gassaway, Officer Shada,

3    and Officer Rupp up there.

4    Q.  I should have asked you that from the very beginning.

5    Where is Mrs. Gibson when you see her having I'm going to call

6    it this conversation with Officer Gassaway?

7    A.  She was standing up on that raised patio area.  Just by the

8    east side of the house there's an east door where you can

9    enter, and she was standing right there.

10   Q.  Okay.  Is she still inside the house or is she outside the

11   house?

12   A.  She's outside.

13   Q.  Okay.  And Gassaway, Rupp, and Friend you recall are also

14   on this what we're calling the concrete patio area.

15   A.  Shada - Officer Gassaway, Shada, and Rupp, and Friend was

16   in the area.

17   Q.  Gassaway, Shada, and Rupp are on this raised patio area?

18   A.  Correct.

19   Q.  Is Friend?

20   A.  Not that I recall.  I remember him standing in front of me.

21   Q.  Where are you?

22   A.  I was still in the driveway area.

23   Q.  Are Shada, Rupp, and Friend dressed either similarly to -

24   as you are today or similarly to as you've described Officer

25   Gassaway?

Mary T. Synowiecki - Direct (Ms. Svoboda)                            28

1    A.   As I've described Officer Gassaway.

2    Q.   And they're all armed.

3    A.   Correct.

4    Q.   And their weapons are all exposed.

5    A.   Correct.

6    Q.   Deputy, do you recall Officer Gassaway and Mrs. Gibson

7    having any other conversation while they're in the position

8    that you've been describing?

9    A.   No, I don't.

10   Q.   At some point, ma'am, do you see Officer Gassaway enter the

11   home?

12   A.   I did.

13   Q.   Do you see other officers enter the home?

14   A.   I did.

15   Q.   Who else entered the home?

16   A.   I believe Officer Shada, and I believe Officer Friend and

17   Rupp.

18   Q.   Okay.

19   A.   And my sergeant Elizabeth Oliver.

20   Q.   Oliver?

21   A.   Oliver, O L I V E R.

22   Q.   Gassaway, Friend, Oliver, Rupp.  Anybody else that you

23   recall?

24   A.   Shada.

25   Q.   Shada.  Once they entered the property, ma'am, what did you

PDF created with pdfFactory trial version www.pdffactory.com

Mary T. Synowiecki - Direct (Ms. Svoboda)                    29

1    do?

2    A.  I remained outside on the perimeter in the driveway area.

3    Q.  Are you there for security position?

4    A.  Correct.

5    Q.  While you're having - again - or excuse me.  While Officer

6    Gassaway is having what I'm calling a conversation with Mrs.

7    Gibson, do you know where John Mass, Mr. Mass, is?

8    A.  Yes.

9    Q.  Where is he, ma'am?

10   A.  He was handcuffed and seated in a task force member's

11   unmarked vehicle.

12   Q.  Okay.  Where is that unmarked vehicle?

13   A.  It was parked in front of the residence on the street.

14   Q.  Okay.  On Spring Street?

15   A.  Correct.

16   Q.  All right.  Do you - while Officer Gassaway is having the

17   conversation with Mrs. Gibson - excuse me, I apologize - do you

18   hear John Mass talking - addressing anyone?

19   A.  I did.

20   Q.  Do you hear that, him talking, during the whole time

21   Officer Gassaway is talking to Mrs. Gibson or at any certain

22   time during the time Officer Gassaway is talking with Mrs.

23   Gibson?

24   A.  There was just at one point I heard him.

25   Q.  Okay.  At one point.

Mary T. Synowiecki - Direct (Ms. Svoboda)                              30

1    A.   Correct.

2    Q.   What is the point that you heard Mr. Mass speak?

3    A.   In between when Officer Gassaway and Mrs. Gibson were

4    talking, I don't recall their exact conversation during that

5    time.

6    Q.   Okay.  Okay.  So it - but it's during the conversation

7    between Mrs. Gibson and Officer Gassaway.

8    A.   Correct.

9    Q.   And what, if anything, do you hear Mr. Mass say?

10   A.   He screamed at the top of his lungs no.

11   Q.   Did you hear Mr. Mass say anything else?

12   A.   I don't recall for sure.  I just recall hearing him scream

13   at the top of his lungs no.

14   Q.   Okay.  Did you - did he - did you hear him say that more

15   than one time?

16   A.   Yes, I did.

17   Q.   Can you - can you recall how many times you heard it or --

18   A.   No, I didn't.  It was loud.

19   Q.   But more than once.

20   A.   Correct.

21   Q.   And loud.

22   A.   Correct.

23          MS. SVOBODA:  Just a second, please, Your Honor.

24          THE COURT:  You may.

25          MS. SVOBODA:  Thank you, Judge.

PDF created with pdfFactory trial version www.pdffactory.com

Mary T. Synowiecki - Cross (Mr. McGough)                    31

1    BY MS. SVOBODA:

2    Q.  Thank you, Deputy.

3           MS. SVOBODA:  Judge, I have no other questions for

4    the deputy.

5           THE COURT:  Mr. McGough?

6           MR. McGOUGH:  Thank you, Your Honor.

7                       CROSS-EXAMINATION

8    BY MR. McGOUGH:

9    Q.  Officer, part of your role as a - as an officer with the

10   fugitive task force is to arrest people that have outstanding

11   warrants.  Correct?

12   A.  Correct.

13   Q.  And in order to do that, you're advised of what - why the

14   person has an outstanding warrant.  True?

15   A.  Correct.

16   Q.  Part of the reason that you're advised of that is so that

17   you know what danger the person poses when you go and arrest

18   him.  Correct?

19   A.  Correct.

20   Q.  And you're also provided with contact information so that

21   you can go to their place of residence in order to arrest them.

22   True?

23   A.  Correct.

24   Q.  Okay.  So when you go to 1616 Spring Street on April the

25   1st, you know you're going to the residence of John Mass.  Yes?

PDF created with pdfFactory trial version www.pdffactory.com

Mary T. Synowiecki - Cross (Mr. McGough)                    32

1    A.   Yes.

2    Q.   Did you also have an arrest warrant at that time for Sarah

3    Penney?

4    A.   I don't recall.

5    Q.   All right.  May have; may not have.  But you don't remember

6    that.

7    A.   Correct, correct.

8    Q.   You know that when you went there on April the 1st, you

9    were going to go get John Mass.  Yes?

10   A.   Correct.

11   Q.   And you were advised of generally what he was charged with

12   or what the warrant was.  Yes?

13   A.   Correct.

14   Q.   And you were aware that it was a gun-related case.

15   A.   Yes.

16   Q.   Okay.  So you get to the scene.  You're there with a number

17   of other officers that you've talked about here today.  True?

18   A.   Correct.

19   Q.   And you're standing around this area by this patio or the

20   stoop and you're engaging in conversations with these officers.

21   Yes?

22   A.   I was not.  I was listening.

23   Q.   Okay.  You hear them engaging in conversations either with

24   Charlotte Gibson or amongst themselves.  Yes?

25   A.   Correct.

PDF created with pdfFactory trial version www.pdffactory.com

Mary T. Synowiecki - Cross (Mr. McGough)                    33

1    Q.  Did you hear them talk about wanting to find the gun?

2    A.  No.  I recall them speaking with Mrs. Gibson just

3    requesting consent to come in, but I don't recall the exact

4    conversation they had.

5    Q.  Did you hear anybody, any of the officers talk about

6    wanting to find a gun?

7    A.  No, I did not.  I don't recall anyone saying specifically

8    that, no.

9    Q.  They may have; they may not have.  You just don't recall

10   it?

11   A.  Correct, I don't recall.

12   Q.  Do you know in hearing these conversations between the

13   officers and Miss Gibson, did you hear them provide her with a

14   reason as to why they wanted to search the house?

15   A.  I might have, but I don't recall.  Again, I don't recall

16   the exact conversation that was going on.

17   Q.  At the time that they're having this conversation with Miss

18   Gibson in regards to searching the house, Mr. Mass is already

19   in custody.  Yes?

20   A.  Yes, he was.

21   Q.  And Mr. Mass was taken into custody outside of the

22   residence.  True?

23   A.  Correct.

24   Q.  Nobody ever went into the residence to arrest him.

25   A.  Correct.

Mary T. Synowiecki - Cross (Mr. McGough)                    34

1   Q.  He arrived at the residence after you guys were already

2   there.  True?

3   A.  Correct, just seconds after we arrived.

4   Q.  And so he never even went in from the time that officers

5   arrived at the scene.  True?

6   A.  Correct.

7   Q.  Okay.  You said that you heard him a number of times in a

8   loud voice yelling no while he's seated in an unmarked car on

9   Spring Street.  True?

10  A.  Correct.

11  Q.  Do you know what he's yelling no about?

12  A.  No, I didn't have contact with him.

13  Q.  Do you know whether or not he's objecting to the search of

14  the residence?

15          MS. SVOBODA:  Objection.  Speculation.

16          THE COURT:  Overruled.

17  A.  No, I did not, because, again, I did not have any verbal

18  contact with him.

19  BY MR. McGOUGH:

20  Q.  Did you hear any of the officers explain to Miss Gibson

21  that they wanted to search the residence for Sarah Penney?

22  A.  Not that I recall.  Not that I recall.

23  Q.  Did you hear any of the officers explain to Miss Gibson

24  that they were only going to search in areas where a person

25  could hide?

Mary T. Synowiecki - Redirect (Ms. Svoboda)                    35

1   A.  Again, I don't recall.

2   Q.  If those conversations happened, you just didn't hear them.

3   A.  No, that's not accurate.  I did.  I just don't recall the

4   exact context of the conversations between the officers and

5   Mrs. Gibson.

6   Q.  Did you do a briefing before you went over and executed

7   this arrest warrant?

8   A.  We did.

9   Q.  And you were part of that briefing?

10  A.  I was.

11  Q.  And at any part of that briefing, were you told that - were

12  you provided with any information that Sarah Penney could also

13  be found at 1616 Spring Street?

14  A.  Again, there's a possibility, sir, but I do not recall

15  specifically her name.

16          MR. McGOUGH:  Nothing further.

17          THE COURT:  Redirect?

18                  REDIRECT EXAMINATION

19  BY MS. SVOBODA:

20  Q.  Deputy, what is your understanding of why you were going to

21  the 1616 Spring Street residence?  Was it because that's where

22  John Mass was supposed to have lived or just stayed there for

23  awhile?

24  A.  Where supposed to have lived.

25          MS. SVOBODA:  Just a second, please, Judge.

Mary T. Synowiecki - (Examination by the Court)                 36

1              Thank you, Judge.

2              Judge, I have no other questions for the deputy.

3                          EXAMINATION

4    BY THE COURT:

5    Q.  Deputy, when Mr. Mass was screaming no from the back of the

6    patrol car, were the windows up or down, door open?

7    A.  The door was open, sir.

8    Q.  And was his screams no audible to the - were the officers

9    still outside the house before they went in?

10   A.  Yes.

11   Q.  And from your point, was it - was his screaming audible to

12   those officers, to your sensation?

13   A.  I can tell for myself because I wasn't engaged in

14   conversation where I was standing near their location, I heard

15   him clear.

16   Q.  All right.  And what's the distance between you and the

17   officers and Miss Gibson in a matter of feet?

18   A.  Approximately 7 to 10 feet.

19   Q.  All right.

20             THE COURT:  If those questions prompt questions by

21   either side, you may now inquire.

22             Miss Svoboda?

23             MS. SVOBODA:  None, Judge.

24             THE COURT:  Mr. McGough.

25             MR. McGOUGH:  Yes.  Thank you, Judge.

Mary T. Synowiecki - Further Cross (Mr. McGough)                    37

1                           FURTHER CROSS-EXAMINATION
2    BY MR. McGOUGH:
3    Q.  The - you said that Mr. Mass was seated in this unmarked
4    police car and the door's open up.  Yes?
5    A.  Correct.  That's what I recall.
6    Q.  As he's yelling no, did you ever see an officer go over and
7    close the door?
8    A.  Yes, I did.
9    Q.  Who did that?
10   A.  I don't recall because shortly after that he was
11   transported to Douglas County Corrections Center.
12   Q.  So this is during the time that he's yelling no.  One of
13   the other officers goes over and closes that door to the
14   unmarked police car.
15   A.  It was shortly after that.  It wasn't during the time that
16   he was screaming because I heard more than one.
17             MR. McGOUGH:  Nothing further.
18             THE COURT:  Miss Svoboda?
19                      FURTHER REDIRECT EXAMINATION
20   BY MS. SVOBODA:
21   Q.  Heard more than one what, Deputy?
22   A.  No.  I - I - more than one no screamed.
23   Q.  Okay.  Thank you.
24             MS. SVOBODA:  Judge, I have nothing further.
25             THE COURT:  May the witness be excused?

1            MR. McGOUGH:  Yes, Your Honor.

2            MS. SVOBODA:  Yes, Your Honor.

3            THE COURT:  All right.  You're excused as a witness.

4            MS. SVOBODA:  Judge, may I step outside the courtroom

5    to get my next witness?

6            THE COURT:  You may.

7            MS. SVOBODA:  Judge, the United States calls Jeff

8    Gassaway to the stand.

9            JEFFREY GASSAWAY, PLAINTIFF'S WITNESS, SWORN

10           THE COURT:  You may inquire.

11           MS. SVOBODA:  Thank you.

12                       DIRECT EXAMINATION

13   BY MS. SVOBODA:

14   Q.  Morning, sir.  Would you mind stating your name one more

15   time?

16   A.  Jeffrey Gassaway.

17   Q.  Are you employed, sir?

18   A.  Yes, with the City of Omaha police.

19   Q.  So you're with Omaha police.  How long have you been with

20   Omaha police?

21   A.  Be 14 years in September.

22   Q.  To what unit are you currently assigned?

23   A.  The Metro Area Fugitive Task Force.

24   Q.  And, sir, is that a group of men and women made up of local

25   law enforcement agencies that work together each day?

Jeffrey Gassaway - Direct (Ms. Svoboda)                          39

1    A.  Yes, it's local and federal.

2    Q.  Local and federal officers.  And what are your duties and

3    responsibilities as an officer working with that task force?

4    A.  We're tasked with locating and apprehending fugitives from

5    justice with felony federal warrants and State warrants.

6    Q.  Okay.  Federal and State.  When you conduct your duties

7    with that task force, Officer, are you dressed similarly as you

8    are today?

9    A.  Yes, we wear tactical gear.  When we're out actually

10   checking residences, we add a raid vest with police markings.

11   Q.  Okay.  When you say the phrase "tactical gear," what's that

12   mean?

13   A.  It's basically a tactical vest with a ballistic protection,

14   carries equipment.

15   Q.  Okay.  Are you armed in your duties, Officer?

16   A.  Yes.

17   Q.  Is your weapon exposed?

18   A.  Yes.

19   Q.  Sometimes, Officer, you'll - in conducting those duties,

20   you'll even be carrying a long barrel?

21   A.  That's correct.

22   Q.  There's no doubt people know that you're a law enforcement

23   officer when you're conducting your daily activities.  Correct?

24   A.  Correct.

25   Q.  And normally, as I said, you work with a group of

PDF created with pdfFactory trial version www.pdffactory.com

Jeffrey Gassaway - Direct (Ms. Svoboda)                    40

1    individuals.  When you go to a house or a residence or anyplace

2    to conduct your duties, you're with a group of officers dressed

3    similarly.

4    A.  Yes.

5    Q.  Officer, I'd like to direct your attention to April 1 of

6    this year, 2011.  Were you working with the fugitive task force

7    in the capacity that you've just described and dressed

8    similarly as you are today but for the additional maybe gear

9    and weapon?

10   A.  Yes.

11   Q.  And ultimately, sir, did you go to the residence at 1616

12   Spring Street where John Mass was arrested that day?

13   A.  Yes.

14   Q.  Okay.  Did you, Officer Gassaway, participate in the arrest

15   of John Mass, actually put hands on him?

16   A.  I did not, no.

17   Q.  Okay.  Let's start from the beginning.  About what time did

18   you go to the 1616 Spring Street residence?

19   A.  It was about 10:00 in the morning, maybe 9:30, 10:00.

20   Q.  All right.  What do you - what do you do when you first get

21   around this residence?

22   A.  Actually, I was one of the first to get in the surveillance

23   position of the residence, and I waited for the other task

24   force members to get there.

25   Q.  Now, why are you in a surveillance position?

PDF created with pdfFactory trial version www.pdffactory.com

Jeffrey Gassaway - Direct (Ms. Svoboda)                    41

1   A.   Just to watch the residence to make sure our suspect or

2   target does not attempt to leave.

3   Q.   What's your target that day?

4   A.   We had a warrant for John Mass.

5   Q.   What was the warrant for?

6   A.   First degree assault.

7   Q.   Any gun charges?

8   A.   Not on this warrant, but the history.

9   Q.   Okay, but not on this warrant on this day that you're

10  there.

11  A.   Correct.

12  Q.   Okay.  Do you have any other targets that day?

13  A.   Yes.

14  Q.   And who?

15  A.   We were advised that there was a co-conspirator or a second

16  suspect with felony warrants, a Sarah Penney.

17  Q.   For the same charges?

18  A.   Yes.

19  Q.   Why are you at the 1616 Spring Street residence to look for

20  John Mass?

21  A.   This is his home of record, and we had been there in the

22  past as well to arrest Mr. Mass.

23  Q.   You personally, too.  Right?

24  A.   Yes.

25  Q.   Why do you believe Sarah Penney might be there?

Jeffrey Gassaway - Direct (Ms. Svoboda)                    42

1    A.   Prior to going to 1616 Spring, we got a briefing that Mr.

2    Mass and Mrs. Penney were possibly in a relationship and she

3    could be at that location.

4    Q.   Okay.  At some point, Officer Gassaway, do you come out of

5    your surveillance position and actually go onto the residential

6    property per se?

7    A.   Yes.

8    Q.   What causes you to do that?

9    A.   Well, initially - Mr. Mass has a twin brother.  His twin

10   brother exited the residence and we stopped him at a location

11   away from the house thinking that it was John Mass.  We

12   received information that Mr. Mass had left on a mini motor

13   bike - Mr. John Mass had left on a mini motor bike.  So we went

14   back and sat around the house again in surveillance positions

15   waiting for John Mass to return.

16   Q.   And did he, sir?

17   A.   He did.

18   Q.   Was he on the mini motor bike?

19   A.   Yes.

20   Q.   And did he drive the mini motor bike onto the property?

21   A.   Yes.

22   Q.   What happened next?

23   A.   He drove the mini motor bike into the garage, but he turned

24   around in the garage and he remained seated on the motorcycle

25   with it running.  We just kind of sat in wait to see what he

1   was going to do, if he was going to leave again.  Then the
2   decision was made to move in and take him into custody.
3   Q.  And is that what officers with the fugitive task force did
4   that day?
5   A.  Yes.
6   Q.  And you did not participate in that part.  Correct?
7   A.  Correct.  I was present, but I did not physically handcuff
8   him or anything like that.
9   Q.  So were you in a security position at that point?
10  A.  Yes.
11  Q.  For the officers arresting Mr. Mass.
12  A.  Yes.
13  Q.  What'd you do next?
14  A.  After he was taken into custody, his mother heard the
15  commotion outside.  She came outside and I spoke with her at
16  that time.
17  Q.  Okay.  Before I ask you about that, sir, did you see what,
18  if anything, the officers who arrested Mr. Mass did with him?
19  In other words, is he still there in the driveway on the mini
20  bike?
21  A.  No, they took him to the front of the house on the street
22  and placed him in a car.
23  Q.  Sir, the front of the house is what street?  16th or
24  Spring?
25  A.  It is on Spring Street.

PDF created with pdfFactory trial version www.pdffactory.com

Jeffrey Gassaway - Direct (Ms. Svoboda)                    44

1   Q.  Okay.  Now, let's take you back to you say you have

2   conversation with Mrs. Gibson - or excuse me, his mother.  Is

3   that Charlotte Gibson?

4   A.  Yes.

5   Q.  You have had conversations with her before.

6   A.  Yes.

7   Q.  Based on your time at her residence.  Correct?

8   A.  Correct.

9   Q.  Officer, where are you when you are talking to Mrs. Gibson?

10  A.  We are standing adjacent to the driveway - I'm sorry, to

11  the garage in the driveway almost between - it's a detached

12  garage maybe about 8 feet between the house and the garage.  So

13  we were kind of in that little space.

14  Q.  Are you on a porch or anything like that?

15  A.  No.  I think there's a sidewalk that leads - there's a

16  couple steps that come out of the house onto a sidewalk that

17  leads into the driveway.  So we were just in front of the house

18  on that sidewalk area.

19  Q.  Okay.  You're between the detached garage and the house.

20  A.  Yeah.  It's in front of just - just forward of the garage

21  in the driveway on like the sidewalk area.

22  Q.  All right.  Is there another - is Mrs. Gibson by a door to

23  the house, not the front door, but another door to the house?

24  A.  There is a side door, yes.  That's where she emerged.

25  Q.  Okay.  And just to come full circle, Officer Gassaway, are

Jeffrey Gassaway - Direct (Ms. Svoboda)                          45

1   you familiar with the layout of the house if you went into that

2   side door?

3   A.   Yes.

4   Q.   Just generally will you tell me what that is.

5   A.   There's a kitchen to the left, and you go down into the

6   basement.

7   Q.   Okay.  Officer, if you know, is Mrs. Gibson already out of

8   the house and on this sidewalk area while her son is being

9   arrested?

10  A.   Yeah, he was already in handcuffs and being escorted to the

11  car when she emerged out of the house.

12  Q.   Okay.  What, if anything, do you hear her say as she comes

13  out of the house.  Strike that.

14       Who talks first when Mrs. Gibson comes out of the house?

15  Mrs. Gibson or an officer with the fugitive task force?

16  A.   Well, she was com - she comes out and she was making

17  general statements, what's going on, what's going on, what's

18  this about.

19  Q.   Okay.

20  A.   And --

21  Q.   Who addressed her?

22  A.   Initially, Officer Jaryzka from the Council Bluffs Police

23  Department.

24  Q.   What, if anything, did you hear that officer say?

25  A.   I heard nothing.

PDF created with pdfFactory trial version www.pdffactory.com

Jeffrey Gassaway - Direct (Ms. Svoboda)                    46

1   Q.  Oh, okay.

2   A.  I assumed he explained to her what was happening.

3   Q.  Okay.  But you heard him say something.

4   A.  Yes.

5   Q.  And then what happened next?

6   A.  I walked up and began conversation with her and asked her -

7   explained the situation as did Officer Jaryzyka, and I told her

8   that we also had reason to believe that a Sarah Penney may be

9   inside of her residence.

10  Q.  First, Officer, will you tell me when you say I explained

11  the situation - first of all, tell me this.  If this other

12  officer - do you have any idea how to spell that officer's

13  name?

14  A.  J A R Y Z Y K A.

15  Q.  J A R Y Z Y K A?

16  A.  I believe so.

17  Q.  Okay.  Who - is that a male or a female?

18  A.  Male.  Travis Jaryzyka.

19  Q.  Travis.  And what agency is Travis with?

20  A.  Council Bluffs Police Department.

21  Q.  That's right.  You said that.  I apologize.  Okay.

22  Officer, if - Officer Gassaway, if let's say Officer Travis is

23  already addressing Mrs. Gibson, why is it you step in?

24  A.  Because it's Omaha's jurisdiction so normally if the - the

25  warrant goes out of Iowa so Travis - it was Travis' warrant;

PDF created with pdfFactory trial version www.pdffactory.com

Jeffrey Gassaway - Direct (Ms. Svoboda)                    47

1    however, since the property fell in Omaha, we kind of switched

2    off and I started dealing with her as opposed to getting

3    permission to search for the second party.

4    Q.   That's how you guys kind of make your way through multi-

5    jurisdictional stuff.

6    A.   Correct.

7    Q.   All right.  Let's start at the beginning.  You say first I

8    spoke to Mrs. Gibson kind of the same way Officer Travis did.

9    What did you tell her first?

10   A.   I explained to her that her son was under arrest for first

11   degree assault and that we had reason to believe that there was

12   a female could be in her basement.  That was the information

13   that we received prior to coming to the house, and we told her

14   the name of the person and that that person also had an active

15   felony warrant and we asked her if we could search the basement

16   area only for that person.

17   Q.   When you say we asked her if we could search, who's the

18   "we"?

19   A.   I was talking collectively meaning a group of officers that

20   were present.

21   Q.   And when you say you asked her for consent to search, will

22   you tell me, if you recall, what words you used to convey that

23   request?

24   A.   I asked her specifically I'd like to  - we'd like

25   permission to search your basement area because that's the

Jeffrey Gassaway - Direct (Ms. Svoboda)                    48

1   information that we had.  I asker her if there was anyone else
2   in the house, and she said her husband maybe but no one else
3   should be in there.  I asked her if she had knowledge of any
4   other people in the basement.  She responded by saying that
5   there should be no one in the house in the basement; however,
6   her sons sneak females into the basement every now and then
7   against her wishes.
8   Q.  What happened next?
9   A.  She was hesitant about giving permission and I told her
10  that we were only going to be looking in areas where a person
11  could hide and we would not be opening drawers or anything like
12  that.  We were going to do a quick sweep, look through the
13  basement, insure that our other fugitive was not in there and
14  then we would leave.
15  Q.  How - explain to me a little bit about how Mrs. Gibson
16  demonstrated to you her - this hesitancy, you say.
17  A.  She was conflicted.  She didn't know if she should and Mr.
18  Mass was yelling from the vehicle not - for her not to let us
19  into the house.
20  Q.  Okay.
21  A.  And as we - she gave permission and as we started walking
22  towards the house Mr. Mass was screaming at that point not to
23  let us in.  And she said - she stopped and said, well, he must
24  not want me to let you in for a reason or there is a reason why
25  he won't - doesn't want me to let you in.  And I just said,

PDF created with pdfFactory trial version www.pdffactory.com

Jeffrey Gassaway - Direct (Ms. Svoboda)                    49

1   hey, we're just looking for Penney and then we would be out of

2   the way.  We'd be out of here.  And she granted us permission.

3   She escorted us into the basement.

4   Q.  She went down the stairs first?

5   A.  Yes.

6   Q.  Did she stay down there the entire time you and your units

7   - the other officers were with you?

8   A.  Yes, she followed us from room to room.

9   Q.  Okay.  I'd like to go back to a couple of things.  If I

10  didn't ask you this before, I apologize.  About what time of

11  day on April 1st are you there, Officer?

12  A.  We originally arrived around 9:30 but we - it was awhile

13  before we arrested and made entry.  So it was about 11:00 when

14  we made entry into the house.

15  Q.  Okay.  Officer, how many officers went into the house with

16  you, if you recall?

17  A.  I don't recall specifically.  I know she only originally

18  wanted to let myself go in the basement.

19  Q.  How do you know that?

20  A.  She said so.  She goes, I will only let you go in.  And I

21  told her for officer safety reasons that that - you know, that

22  that was not our wishes, that we had to - for safety reasons,

23  we would take more than myself into the basement.  And she

24  complied.

25  Q.  Okay.  Roughly, how many officers probably went in though.

PDF created with pdfFactory trial version www.pdffactory.com

Jeffrey Gassaway - Direct (Ms. Svoboda)                    50

1    A.  I would say --

2    Q.  Half a dozen?

3    A.  I would say five or six, yes.

4    Q.  All dressed similarly to - as you've described today.

5    A.  Yes.

6    Q.  When you - let's go back to when you and Mrs. Gibson are

7    just coming together and you're talking about why you're there,

8    like I said.  How is she dressed?

9    A.  Just T-shirt and pants.

10   Q.  Okay.  Is she crying?

11   A.  No.

12   Q.  Does she comport herself in such a way that you believe

13   she's under the influence of alcohol or controlled substances?

14   A.  No.

15   Q.  Does she appear to you to be articulate, rational, seem to

16   know what's going on?

17   A.  Yes.

18   Q.  Once she allows you into the property and the other

19   officers and you're all down in the basement, does she ever

20   withdraw that consent?

21   A.  No.

22   Q.  Does she ever say, stop, I don't want you to search here

23   anymore or in any way convey that the consent was withdrawn?

24   A.  No.

25   Q.  Did she ever convey anything to you that made you believe

PDF created with pdfFactory trial version www.pdffactory.com

Jeffrey Gassaway - Direct (Ms. Svoboda)                    51

1   that she wanted you out - you and the other officers out of the

2   property?

3   A.  No.

4   Q.  I'd kind of like to narrow down this - your testimony about

5   when you say you hear John Mass yelling and screaming.  Is that

6   occurring, Officer Gassaway, the entire time you are addressing

7   Mrs. Gibson?

8   A.  Pretty much, yes.

9   Q.  I understand you've testified that you remember him

10  yelling.  Do you remember the words he's yelling?

11  A.  Yes.

12  Q.  What do you hear him saying?

13  A.  Don't let him in.  Don't let him in.

14  Q.  Did you ever hear him, John Mass, say or yell during this

15  time anything that conveyed to you he was denying consent to

16  search the property?

17  A.  No.

18  Q.  He was denying consent to search the basement.

19  A.  No.

20  Q.  Did he - did you ever hear Mr. Mass say you cannot search

21  the basement?

22  A.  No.

23  Q.  Did you ever hear Mr. Mass say, you cannot search my

24  bedroom?

25  A.  No.

Jeffrey Gassaway - Direct (Ms. Svoboda)                    52

1  Q.  Was Mr. Mass - sorry - were Mr. Mass' statements when he

2  was yelling always directed toward his mother?

3  A.  Yes, they were.

4  Q.  Officer Gassaway, it's Mrs. Gibson going down the stairs

5  first?  Quite frankly, I assume since you're the one that has

6  been speaking to her, are you the one behind her?

7  A.  Yes.

8  Q.  Okay.  Officer, as you're defending - sorry - descending

9  the stairs, do you have your weapon drawn?

10 A.  I have it at the ready position, yes.

11 Q.  What does that mean?

12 A.  I didn't have it aimed at - or targeted on anybody.  I just

13 had it down and ready in case I had to react to something.

14 Q.  For those of us that don't wear those, is that - does that

15 mean you've taken your gun out of your holster and you're

16 holding it down by your side?

17 A.  Yes.

18 Q.  Would the other officers with you probably have the same

19 stance?

20 A.  Probably, but, you know, I'm not sure.

21 Q.  Okay.

22 A.  I mean, the fifth person going down may not have.  I don't

23 know.

24 Q.  Okay.  Your - your entire unit's concern at first is always

25 going to be safety - well, always going to be safety, period.

Jeffrey Gassaway - Direct (Ms. Svoboda)                    53

1    A.   Correct.

2    Q.   And you're entering into an area where you have no idea -

3    in fact, you're looking for someone with a warrant, so you're

4    always going to be at the ready.

5    A.   That's correct.

6    Q.   Officer, did you participate personally in the search -

7    well, looking for the Penney - of the entire basement area?

8    A.   Yes.

9    Q.   Okay.  Will you describe it to me, please?

10   A.   We went down and the basement's kind of compartmentalized

11   with make-shift walls.  Some walls were maybe curtains, and

12   then some were maybe bookcases or something that were dividing

13   the rooms.  There was a dog in the basement.  We - and there

14   was a laundry room.  There was a living area with a bed, a

15   couple of desks down there.

16   Q.   Okay.  What did you do upon your entry into the basement?

17   A.   I walked - because Miss Mass was standing in front of me, I

18   walked around her which took me through the laundry room and

19   back around and I was just looking where - obvious places where

20   people would hide.  And I came back out and then I went into

21   the living area where there was a bed.

22   Q.   Okay.  What else is in the living area?

23   A.   There's a desk - there are two desks with - one had a TV

24   monitor that had a surveillance camera operating of the

25   exterior of the house, maybe a laptop and there was other stuff

PDF created with pdfFactory trial version www.pdffactory.com

Jeffrey Gassaway - Direct (Ms. Svoboda)                    54

1    on top of it.  Behind the desk was a bed.

2    Q.   Okay.  In your report, you referred to one of the desks as

3    a make-shift desk.  Would you explain that, please?

4    A.   Sure.  It was a solid wood top, and it was a thick solid

5    wood top on top of two speaker boxes with an opening in the

6    middle.

7    Q.   Sure.  Did you look at that opening in the middle?

8    A.   I did.

9    Q.   And what, if anything, did you find?

10   A.   I saw a black tactical vest exactly like mine that I wear,

11   and I saw a handgun protruding from the vest.

12   Q.   What'd you do next?

13   A.   I explained to Miss - Mrs. Mass what we - what I saw - what

14   I found down there, and I photographed it in place.

15   Q.   Then what happened?

16   A.   I seized it as evidence and later turned it over to a

17   Special Agent Nolte.

18   Q.   Okay.  Did you have any other conversation with Mrs. Gibson

19   while you're down here in the basement and after you have found

20   this gun?

21   A.   I explained to her that it was - we'd have to take the gun

22   because it was used in - or possibly used in a crime.  And I

23   told her that it would be taken and processed and she could

24   claim it later.  She explained to me that it was her husband's

25   and she didn't have any idea why it would be in the basement.

PDF created with pdfFactory trial version www.pdffactory.com

Jeffrey Gassaway - Direct (Ms. Svoboda)                    55

1   Q.  Okay.  Did you find anything else - you or the other
2   officers with you find anything else in the basement that was
3   significant to you that day?
4   A.  No.
5   Q.  Did you find - was Sarah Penney down there, sir?
6   A.  She was not.
7            MS. SVOBODA:  Your Honor, may I approach, please?
8            THE COURT:  You may.
9   BY MS. SVOBODA:
10  Q.  Officer Gassaway, I've put four exhibits in front of you.
11  Generally, sir, are they four photographs?
12  A.  Yes.
13  Q.  I draw your - first, let's do this:  Exhibit Number 5, sir,
14  can you identify that, and if you can, would you please do so?
15  A.  Exhibit Number 5 is a photo outside of the living area or
16  the bedroom area from the doorway.  I took a photo as if I was
17  looking into the room for an overall picture.
18  Q.  You took Exhibit - the Exhibit Number 5.  Correct?
19  A.  I did.
20  Q.  So the true and accurate representation of the area of the
21  basement to which you just testified?
22  A.  Yes.
23  Q.  Please direct your attention to Exhibit Number 6, sir.
24  A.  Yes.
25  Q.  Can you identify that, and, if you can, would you please to

Jeffrey Gassaway - Direct (Ms. Svoboda)                           56

1  so?

2  A.  Yes.  This is a midrange view of the make-shift desk.  This

3  is as I - as it was before I touched anything.

4  Q.  Does it --

5  A.  Um - go ahead.

6  Q.  Does it truly and accurately reflect the view of - that is

7  in Exhibit Number 6 as you were there taking the picture?

8  A.  Yes.

9  Q.  Sir, would you turn your - I'd like - direct your

10  attention, please, to Exhibit Number 7.  Can you identify that,

11  and, if you can, would you please do so?

12  A.  Yes.  This is the tactical vest with the handgun holstered.

13  It's a close-up view before I removed it.

14  Q.  Does Exhibit Number 7 reflect a true and accurate

15  representation of that gun and vest as you were looking at it

16  when you were in the basement and before you took any action to

17  remove it?

18  A.  Yes.

19  Q.  Exhibit Number 8, please, Officer.  Can you identify that,

20  and, if you can, would you please do so?

21  A.  Yes, this is the handgun that was holstered in the vest

22  that's it's a picture of it removed from the vest on top of the

23  vest, removed from the holster sitting on top of the vest.

24  Q.  So Exhibit Number 8 is not - does not represent as you

25  initially saw the vest and the gun.  Correct?

Jeffrey Gassaway - Direct (Ms. Svoboda)                    57

1    A.  Correct.

2    Q.  You have manipulated the gun out of the vest and set it on

3    top of the vest.  Correct?

4    A.  Correct.

5    Q.  And then you took this photograph.

6    A.  Yes.

7    Q.  Does Exhibit 8 truly and accurately reflect the vest and

8    the gun as you manipulated them after you found them?

9    A.  Yes.

10         MS. SVOBODA:  Your Honor, I'd offer Exhibits 5

11   through 8 into evidence.

12         THE COURT:  Any objection?

13         MR. McGOUGH:  No, Your Honor.

14         THE COURT:  Exhibits 5 through 8 are received.

15         MS. SVOBODA:  Thank you.

16   BY MS. SVOBODA:

17   Q.  Officer, could I - would you please look at Exhibit Number

18   5?

19   A.  Yes.

20   Q.  Earlier in your testimony, you talked about two desks, and

21   you talked about one having a surveillance equipment on it, and

22   then we also talked about a make-shift desk.  This desk that is

23   underneath the - looks like a TV or a computer monitor in

24   Exhibit Number 5.  Okay?  Officer, is that the make-shift desk?

25   A.  No, that is not.

1    Q.   Okay.  Officer, at the very front of Exhibit Number 5 is a

2    chair, and then to the - our left of that chair, you see the

3    start of a table, maybe a white piece of paper on it, top of

4    it.  Are you with me, sir?

5    A.   Yes.

6    Q.   Is that the make-shift desk?

7    A.   Yes.

8    Q.   Okay.  And then, Officer, I think you said there was a bed

9    somewhere close to that make-shift desk.  Is that true?

10   A.   It's behind the other desk, so it's behind the - as you're

11   looking at this photo, there's a - the surveillance camera and

12   there's a lamp without a lamp shade.

13   Q.   Uh-huh.

14   A.   The bed is behind that desk.

15   Q.   Okay.  Was this - is the surveillance camera in Exhibit

16   Number 5, is it the thing that looks like a monitor turned on

17   or a TV?

18   A.   Yes.

19   Q.   Was it on?

20   A.   Yes.

21   Q.   So, now, please, sir, could we - would you please go to

22   Exhibit Number 6?  The view of the desk and that - it is what

23   has been referred to as the make-shift desk.  Correct?

24   A.   Correct.

25   Q.   Officer, what we're looking at in Exhibit Number 6 is - are

Jeffrey Gassaway - Direct (Ms. Svoboda)                    59

1    two chairs and then this make-shift desk.  The chair on the
2    left seems to be a bit more prominent in the photograph.  The -
3    where is the vest and the gun in Exhibit Number 6?
4    A.  It's directly behind the light gray chair.  You can barely
5    see it in the - in the photo.  It's kind of like a black
6    object.  It's directly underneath the desk underneath the white
7    tablet or whatever that is.
8    Q.  Okay.
9          MS. SVOBODA:  Your Honor, may I approach for a
10   minute, please?
11         THE COURT:  You may.
12         MS. SVOBODA:  Your Honor, may I speak to the officer
13   right here for just a minute?
14         THE COURT:  Use the mike.
15   BY MS. SVOBODA:
16   Q.  Will you show me on Exhibit Number 6 where you referenced -
17   where you just said you can barely see it?
18   A.  It would be right there.
19   Q.  Okay.  Thank you.
20      The part of Exhibit Number 6 that you say you can barely
21   see is this almost blue or blackish looking type of material in
22   between the most prominent chair and underneath the white
23   tablet on the desk?
24   A.  Correct.
25   Q.  Thank you.

Jeffrey Gassaway - Direct (Ms. Svoboda)                          60

1          MS. SVOBODA:  Just a second, please, Your Honor.

2   BY MS. SVOBODA:

3   Q.  Can you estimate for me - would you please estimate for me,

4   Officer, the dimensions of this area underneath the desk?

5          MR. McGOUGH:  Objection.  Foundation and speculation.

6          THE COURT:  Overruled.

7   A.  It was about the size of a desk that you're sitting at

8   right now.  Whatever dimensions that'd be 3, 4 feet wide, 2

9   feet deep with probably about a 2-and-a-half feet opening, 3

10  feet opening underneath the desk.

11  BY MS. SVOBODA:

12  Q.  How tall are you, Officer Gassaway?

13  A.  Five foot, 9 inches tall.

14  Q.  Would you be able to fit yourself in there?

15  A.  Yes.

16  Q.  Sir, you - after you were at the 16th and Spring Street

17  residence and in connection with this case, you'd had contact

18  with Sarah Penney.  Correct?

19  A.  Yes.

20  Q.  In fact, you took a statement from her, a Mirandized

21  statement.  Correct?

22  A.  I took part in that interview, yes.

23  Q.  About how tall would you estimate Sarah Penney is?

24  A.  About 5-7 - 5-8.

25  Q.  In your opinion, would she be able to fit underneath this

PDF created with pdfFactory trial version www.pdffactory.com

Jeffrey Gassaway - Cross (Mr. McGough)                          61

1   desk or in this area where the gun was found underneath the

2   make-shift desk?

3   A.   Yes.

4   Q.   Thank you, Officer Gassaway.

5             MS. SVOBODA:   Judge, I have no other questions for

6   the officer.

7             THE COURT:   Mr. McGough?

8             MR. McGOUGH:   Thank you, Your Honor.

9                        CROSS-EXAMINATION

10  BY MR. McGOUGH:

11  Q.   Okay.  So before you're at 1616 Spring Street, you have a

12  conversation withe Special Agent Clay Nolte about Mr. Mass; do

13  you not?

14  A.   Correct.

15  Q.   And Mr. Clay Nolte, Special Agent Clay Nolte, he's the

16  individual that's seated with - with Miss Svoboda?

17  A.   Yes.

18  Q.   All right.  So he calls you and talks to you generally

19  about this before you go over to the house.

20  A.   Yes.

21  Q.   And in that conversation he tells you that Mr. Mass is

22  being accused of a gun crime.   Yes?

23  A.   Correct, yes.  No, no, it was a felony assault involving a

24  gun, yes, so that was the conversation.

25  Q.   He told you that he produced a large caliber handgun,

PDF created with pdfFactory trial version www.pdffactory.com

Jeffrey Gassaway - Cross (Mr. McGough)                    62

1   possibly a .45 caliber.  Yes?

2   A.   Yes.

3   Q.   And that he had brandished the weapon at the victim and

4   others in the room.  Yes?

5   A.   Correct.

6   Q.   And you know all that before you go over to 1616 Spring

7   Street.

8   A.   I do, yes.

9   Q.   So when you get over to 1616 Spring Street, do you hear

10  conversations with the other officers as you guys were talking

11  to Miss Gibson?

12  A.   I'm sorry.  Say that again?

13  Q.   Sure.  There's conversations between you and Miss Gibson

14  while you're outside on the stoop area.  Right?

15  A.   Yes.

16  Q.   And other officers are gathered around?

17  A.   Yes.

18  Q.   And are you conversing with those other officers as well?

19  A.   No.

20  Q.   Are they conversing with each other?

21  A.   I assume.  They are waiting to see if we're going to search

22  or not.

23  Q.   Did you hear any of them say, we need to find the gun?

24  A.   No.

25  Q.   Did you ever indicate to any of the other officers that you

Jeffrey Gassaway - Cross (Mr. McGough)                              63

1  wanted to find the gun?

2  A.  During the briefing, we told them it was a gun crime and

3  there was possibly this .45 in the - in the residence and if we

4  saw it in plain view, that we were to seize it as part of the

5  crime.

6  Q.  Okay.  And you indicated that you've been to that residence

7  before and you've personally arrested Mr. Mass before.  Yes?

8  A.  Yes.

9  Q.  You knew that's his residence.

10  A.  Yes.

11  Q.  And you knew that he lived down in the basement.

12  A.  Yes.

13  Q.  That that was his area.

14  A.  Yes.

15  Q.  Did you ask him for consent at any time to search?

16  A.  I did not.

17  Q.  Did any of the other officers ask him for his consent to

18  search?

19  A.  No, we did not.

20  Q.  You hear him yelling out no, no or don't let them go in

21  there, or something along those lines?

22  A.  Yes.

23  Q.  And Miss Gibson comments on it.  Right?

24  A.  She does.

25  Q.  Okay.  Then when you're talking to Miss Gibson, you tell

PDF created with pdfFactory trial version www.pdffactory.com

Jeffrey Gassaway - Cross (Mr. McGough)                          64

1    her, hey, look, I'm only going to go in there just to look for
2    where a person could be.   Right?
3    A.   Yes.
4    Q.   You indicated to her that you had received some information
5    that Sarah Penney may be at the residence.
6    A.   That's correct.
7    Q.   Is that information received when you have the conversation
8    with Special Agent Clay Nolte?
9    A.   Yes.
10   Q.   And what specifically did he indicate to you that gave you
11   reason to believe that Miss Penney may be at that residence?
12   A.   That they are possibly - that they committed the assault
13   together and they are possibly in a relationship and that Mr.
14   Mass' vehicle is there.   They could both possibly be inside the
15   residence.
16   Q.   Those are the words he used, "possibly in a relationship"?
17   A.   Yes.
18   Q.   "Possibly be at the residence"?
19   A.   Yes.
20   Q.   Do you know if anybody had ever conducted any surveillance
21   and seen her at 1616 Spring Street?
22            MS. SVOBODA:   Objection.   Relevance.
23            THE COURT:   Overruled.
24   A.   Say that again?
25   BY MR. McGOUGH:

PDF created with pdfFactory trial version www.pdffactory.com

Jeffrey Gassaway - Cross (Mr. McGough)                           65

1   Q.   Sure.  Do you know if anybody had ever performed

2   surveillance and seen Miss Penney at 1616 Spring Street?

3   A.   No.

4   Q.   Do you know if anybody had given a witness statement or a

5   proffer interview that Mr. Mass and Miss Penney were involved

6   in a relationship?

7   A.   Are you talking before this date or since?

8   Q.   Before.

9   A.   Not before, no.

10  Q.   So the only thing that you had to go on that she may

11  possibly be there is that what Special Agent Nolte told you.

12  A.   Yes, that they committed the assault together and they were

13  possibly in a relationship.

14  Q.   Okay.  Did you have a separate home address for Miss

15  Penney?

16  A.   We did.

17  Q.   And was she ultimately arrested at that address on that

18  same day?

19  A.   No, she was not.

20  Q.   At her home address?

21  A.   She was not, no.

22  Q.   Where was she arrested?

23  A.   Her place of employment.

24  Q.   On that same day, April the 1st?

25  A.   Yes.

Jeffrey Gassaway - Cross (Mr. McGough)                          66

1    Q.   Okay.  So Miss Gibson tells you - well strike that.

2         You tell her you're only going to look in areas where a

3    person could hide.  Right?

4    A.   Correct.

5    Q.   And she agrees on that basis.

6    A.   Correct.

7    Q.   Did you - and then you indicated that you went down into

8    the basement.  You followed her?

9    A.   Correct.

10   Q.   And that there's about half a dozen or so officers that

11   accompany you during that search.

12   A.   Yes.

13   Q.   Did you indicate to them that they're only supposed to look

14   in areas where a person could be found?

15   A.   According to law, they know that.  When we go and search

16   for people, we do not open dresser drawers.  We're not there

17   executing a search warrant.  We're executing an arrest warrant.

18   We're looking for a body.  That's it.  So they don't have to be

19   told that, you know, they cannot open drawers.

20   Q.   But you would ask for consent to search.  Right?

21   A.   Right.

22   Q.   And you got consent to search.  Right?

23   A.   Right.

24   Q.   But the consent to search was limited to only looking in

25   places where people could be found.  Right?

Jeffrey Gassaway - Cross (Mr. McGough)                    67

1    A.   Correct.

2    Q.   And did you indicate to the other officers that hey, we've

3    got this limited consent to search?

4    A.   I didn't say those words, but they're all veteran officers

5    and we do this every day.  We know the rules that we were there

6    looking for a body and that we could not manipulate any items

7    to try to find a body where they would not normally be found.

8    Q.   How long did the search of the basement occur?

9    A.   Fifteen minutes maybe.

10   Q.   Okay.  So Exhibits Number - looking at Exhibits Number 7

11   and 8, you are the one who found the gun underneath the make-

12   shift desk?

13   A.   Yes.

14   Q.   And if I understand your testimony, you're also the officer

15   that took the photographs shown in Exhibits 7 and 8.  Yes?

16   A.   Yes.

17   Q.   Did anybody else see this area other than you before you

18   moved the vest and the gun?

19   A.   I don't think so, no.

20   Q.   Okay.  You said this make-shift desk is - is a tabletop or

21   a piece of wood sitting on two speakers.  Right?

22   A.   Yes.

23   Q.   And then Exhibit Number 7 - when you look at Exhibit Number

24   7, on the left-hand side of Exhibit Number 7, Plaintiff's

25   Exhibit 7, is that one of the speakers that it's sitting on top

PDF created with pdfFactory trial version www.pdffactory.com

Jeffrey Gassaway - Cross (Mr. McGough)                              68

1    of?

2    A.  Yes.

3    Q.  And it appears from the photograph that you took that the

4    width of the piece of wood that forms the make-shift desk is

5    flush with the end of the speaker.  Do you see that?

6            MS. SVOBODA:  I'm sorry, Mr. - Your Honor.  Could Mr.

7    McGough repeat that, please?

8            THE COURT:  If you would.

9            MS. SVOBODA:  I didn't hear the question.

10   BY MR. McGOUGH:

11   Q.  Do you see the speaker on the left-hand side - do you see

12   the speaker on the left-hand side of Exhibit Number 7?

13   A.  I do.

14   Q.  And does the top - do the top edge of the speaker appear to

15   be flush with the end of the desk?

16   A.  It doesn't appear so.  Are you talking - are you talking

17   the front portion?

18   Q.  I'm asking whether there's any overlay.

19   A.  It looks like there's a slight overlay to me.

20   Q.  And when you say "slight,"  what's a slight mean?

21   A.  Couple inches.

22   Q.  Okay.  And that speaker - how wide is that speaker, do you

23   know?

24   A.  No.  It's - I didn't take a measurement of it, no.

25   Q.  Couple inches?

Jeffrey Gassaway - Cross (Mr. McGough)                    69

1   A.  No, it's bigger than that, bigger than a couple inches.
2   Q.  What --
3           MS. SVOBODA:  Objection.  Referencing which speaker
4   is Mr. McGough talking about?
5           MR. McGOUGH:  The left-hand side.
6           THE COURT:  Sustained.
7   BY MR. McGOUGH:
8   Q.  Looking at the speaker on the left-hand side of Exhibit
9   Number 7, do you know how wide that speaker is?
10  A.  Two to 3 foot wide.
11  Q.  Okay.  Okay.  So then Exhibit Number 7 shows us one speaker
12  on the left-hand side of the picture.  Yes?
13  A.  Yes.
14  Q.  And then it looks like a smaller speaker turned backwards
15  in the middle.  Yes?
16  A.  It's a smaller box, appears to be the rear, yes.
17  Q.  Okay.  Is that a wire that's coming out of it on the right-
18  hand side?
19  A.  I can't tell, but something is.
20  Q.  Okay.  So this box.  And then is this another speaker
21  that's - that's laying down on the ground?
22  A.  Yeah, there's something lying there.  I don't know if it's
23  a speaker.  It looks hollowed out to me.
24  Q.  Looking at Exhibit Number 6, then, is that a better view of
25  the object on the right-hand side of Exhibit Number 7?

Jeffrey Gassaway - Cross (Mr. McGough)                    70

1   A.  It is, but I can't tell if it's a speaker or some sort of
2   hollowed out wooden object.
3   Q.  And then at the end of it, then we've got, looking at
4   Exhibit Number 6, all the way on the right-hand side of the
5   make-shift desk, then you've got the other speaker that the
6   desk is sitting on for balance.  Yes?
7   A.  Yes.
8   Q.  Okay.  So these items - looking at Exhibit Number 7, it
9   appears that - that the speaker on the left-hand side, the box
10  in the middle, and the object on the right-hand side all appear
11  to be touching.  Is that true?
12  A.  Yes.
13  Q.  And then continuing that through onto Exhibit Number 6, it
14  appears that the object that we can see better now, which you
15  called the hollowed out box underneath the make-shift desk on
16  the right-hand side, and then following that to the speaker
17  that it's sitting on to the right of that for balance, it
18  appears that those items are also touching.  Would you agree
19  with that?
20  A.  It appears so.
21  Q.  And you believe an individual could have fit underneath
22  this desk with all of these items there?
23  A.  Absolutely.
24  Q.  Well, you would have seen that individual right away; would
25  you have not?

PDF created with pdfFactory trial version www.pdffactory.com

Jeffrey Gassaway - Cross (Mr. McGough)                        71

1              MS. SVOBODA:  Objection.  Relevance.

2              THE COURT:  Sustained.

3    BY MR. McGOUGH:

4    Q.  Okay.  Looking at Exhibit Number 7 again, it's your

5    testimony that that's the - that's the way it was before

6    anybody disturbed the scene.

7    A.  Number 7?

8    Q.  Yes.

9    A.  Yes.

10   Q.  Was the gun in a holster?

11   A.  It was, yes.

12   Q.  And then as part of the vest folded back --

13   A.  What was that again?

14   Q.  Was part of the vest folded back?

15   A.  It's kind of hanging over the - the speaker box.  I don't

16   know if it's folded back.  It's just kind of like hanging over.

17   Q.  Well, the vest is folded in half, isn't it?

18   A.  It doesn't look like it to me.

19             MS. SVOBODA:  I'm sorry.  Were you referencing

20   Exhibit Number 7, then, Mr. McGough?

21             MR. McGOUGH:  I was.

22             MS. SVOBODA:  Thank you.

23   BY Mr. McGOUGH:

24   Q.  Where would an individual have fit on April the 1st

25   underneath this make-shift desk?

Jeffrey Gassaway - Redirect (Ms. Svoboda)                    72

1   A.   Behind it.  In my experience - I've been on the task force

2   for four years, and we've found people hiding in every place

3   imaginable, dressers, inside of speaker boxes, under

4   mattresses, between mattresses, in refrigerators, in trash

5   cans.  Wherever they can hide, they will hide no matter how big

6   or how small.

7   Q.   So you believe that somebody could have fit behind these

8   speaker boxes?

9   A.   Yes.

10  Q.   And was it your intent to look behind those speaker boxes?

11  A.   It was.  It was my intent to look under the desk to ensure

12  no one was behind or under the desk.

13  Q.   Do you know how much space there was behind the desk or

14  behind these speaker boxes?

15  A.   Three to 4 feet.

16         MR. McGOUGH:  No further questions.

17         THE COURT:  Redirect?

18                    REDIRECT EXAMINATION

19  BY MS. SVOBODA:

20  Q.   Officer Gassaway, as you came into the room and - and I'm

21  talking about the room exhibited by the photographs - and you

22  approached the desk, were you able to see under the desk in

23  this legroom area?

24  A.   No.  In these photos, the light is now on.  We were

25  searching with flashlights when we first went in.

Jeffrey Gassaway - (Examination by the Court)                73

1    Q.  Okay.  But the only way you were able to see what we're

2    calling under the desk or the legroom area of the desk was to

3    bend down and look into it.  Correct?

4    A.  Correct.

5    Q.  Okay.  You could not obviously see that area as you are

6    standing above the desk.

7    A.  Correct.

8    Q.  Thank you.

9          MS. SVOBODA:  Judge, I have no other questions for

10   the officer.

11          THE COURT:  Amy, give me the pencil case that you

12   have or the marking pencil.  No, the marking pencil.  Do we

13   have a case up here with marking pencils?  Do you have a

14   Sharpie there?  All right.  Give it to the witness.

15          THE WITNESS:  Thank you.

16                        EXAMINATION

17   BY THE COURT:

18   Q.  Officer, if you'll now place Exhibit 6 and 7 in front of

19   you.

20   A.  Yes.

21   Q.  Now, on Exhibit 6 you indicated I believe in regard to Miss

22   Svoboda's inquiry that you - that portion of that photograph it

23   shows this vest or gun aspect.  Is that right?

24   A.  Yes.

25   Q.  Would you now in a large circle, circle that and place your

Jeffrey Gassaway - Further Redirect (Ms. Svoboda)                    74

1    initials under the circle?

2    A.   Sure.

3    Q.   Now hold that up for everybody to see.

4    A.   (Witness complies)

5    Q.   All right.   Okay.   Now, looking at Exhibit 7, is that what

6    you had circled in Exhibit 6?

7    A.   Yes, Your Honor.

8    Q.   And is that what you saw in Exhibit 7 after you moved the

9    white or light gray chair out of the way?

10   A.   Yes, Your Honor.

11   Q.   Okay.   All right.

12            THE COURT:   If those questions prompt questions by

13   either side, you may now inquire.

14            Miss Svoboda?

15                    FURTHER REDIRECT EXAMINATION

16   BY MS. SVOBODA:

17   Q.   You moved that chair out of the way, the most prominent

18   chair in Number 6?

19   A.   Yes, to get a good look underneath the desk.

20   Q.   Was the chair pushed up into the legroom area of the desk?

21   A.   It was as is in this photo.

22   Q.   I'm sorry.   I just want to make sure I'm the same way you

23   are.

24   A.   Okay.

25   Q.   In Number - in Exhibit Number 6, the chair on the left, is

PDF created with pdfFactory trial version www.pdffactory.com

Jeffrey Gassaway - Further Cross (Mr. McGough)                    75

1    that where it was when you took the photograph?

2    A.  Of Number 6 or Number 7?

3    Q.  Of Number 6.

4    A.  Yes.

5    Q.  Okay.  There's a chair on the - there's a chair seat that's

6    shown on the right side of Exhibit Number 6.  Correct?

7    A.  Yes.

8    Q.  Did you move that chair prior to taking the photograph?

9    A.  No.

10   Q.  Okay.  Thank you.

11        Wait.  One more thing, please.  No, no, thank you.

12            MS. SVOBODA:  No more questions.

13            THE COURT:  Mr. McGough?

14            MR. McGOUGH:  Thank you, Judge.

15                    FURTHER CROSS-EXAMINATION

16   BY MR. McGOUGH:

17   Q.  Exhibit Number 6, the top left-hand corner of Exhibit

18   Number 6, is that the wall of the basement?

19   A.  The top left?

20   Q.  Yes.

21   A.  Next to the Buddha object?

22   Q.  Yes.

23   A.  Yeah, I assume so, yes.

24   Q.  So the desk is pushed up against the wall?

25   A.  Yes.

PDF created with pdfFactory trial version www.pdffactory.com

Jeffrey Gassaway - Further Cross (Mr. McGough)                76

1            MR. McGOUGH:  Nothing further.

2            THE COURT:  May the witness be excused?

3            MS. SVOBODA:  Yes, Judge.

4            THE COURT:  All right.

5            If you will drop the exhibits and the marking pencil

6    by the clerk as you pass.  You're excused as a witness.

7            THE WITNESS:  Thank you.

8            MR. SVOBODA:  Judge, may I have just one moment to

9    speak to Officer --

10           THE COURT:  You may.

11           MS. SVOBODA:  -- Gassaway?

12           THE COURT:  You may.

13           MS. SVOBODA:  Thank you, Judge.

14           Judge, United States rests for this - for this part

15   of the suppression --

16           THE COURT:  Very well.

17           Mr. McGough, do you have evidence you wish to

18   present?

19           MR. McGOUGH:  Judge, may I have one moment to  --

20           THE COURT:  You may.

21           MR. McGOUGH:  -- confer with my client?

22           THE COURT:  You may.

23           MR. McGOUGH:  Thank you, Judge.  No evidence.

24           THE COURT:  Now, this is on the motion to suppress.

25   Is that right?

1          MR. McGOUGH:  Yes.

2          THE COURT:  Now, we also have the motion to dismiss

3     and the motion to sever.

4          Now, I take it, on the motion to sever there is some

5     sort of statement by a co-defendant?  Is that - I take it, that

6     was the gist of your motion, that there was a statement of a

7     co-defendant and - which had <u>Bruton</u> problems or something of

8     that nature or something?

9          MR. McGOUGH:  There's two things, Judge:  There's the

10    - there's a post Miranda on Sarah Penney, who is the co-

11    defendant.  And then also, like in this case, the Government's

12    got a number of telephone conversations that Miss Penney made

13    from Douglas County Jail to her family members and talked about

14    this case.  That would certainly be relevant in the case

15    against her but are going to be --

16         THE COURT:  Is those statements before the Court or

17    something so I know what we're talking about?

18         VOICE:  They're not, Judge.  I - it's my

19    understanding that the Government's in agreement with the way

20    they filed their brief in saying that all of the facts, as Mr.

21    McGough has indicated, are true and correct.  I took that that

22    the Government was agreeing that those facts exist.

23         THE COURT:  I'm not going to rule on a motion to

24    sever on that basis.  I need to see what the statements are

25    that the parties have and that you have in dispute.  And if the

PDF created with pdfFactory trial version www.pdffactory.com

1    parties want to agree upon a stipulated exhibit that says this
2    is the statements that Miss Penney made and also that these are
3    the statements which the Government intends to use in a joint
4    trial, then I can take a look at that.  And also I think Miss
5    Svoboda has talked about something about a redaction and then I
6    would propose that if the Government says that while there are
7    statements we're going to use, we're going to have to redact
8    and these are the redactions that we would use.  And then the
9    Court will have a basis in order to determine whether or not
10   the statements could be redacted and whether or not there would
11   be any prejudicial joinder.
12            So, you know, I need something from both parties and
13   I guess it's not difficult because you can both agree upon what
14   those statements are and Miss Svoboda can propose her proposed
15   redaction in the case so that the Court can take a look at it
16   and see whether or not <u>Bruton</u> can be avoided or whether it
17   comes into play or anything of that nature.
18            Do you have any difficulty with that, Mr. McGough?
19            MR. McGOUGH:  No, Your Honor.  We can certainly
20   provide the Court with that.
21            MS. SVOBODA:  We can do that, Judge.
22            MR. McGOUGH:  It's not a problem.
23            THE COURT:  All right.  Now, that's just the motion
24   to sever.
25            MR. McGOUGH:  Right.

1          VOICE:  Now, the motion to dismiss --

2          VOICE:  Right.

3          THE COURT:  -- we have a situation here where we have

4    a venue issue.  That's essentially is your motion to dismiss.

5    It's a venue issue.  Is that right?

6          VOICE:  Yes, Your Honor.

7          THE COURT:  All right.  Now, do we have a stipulation

8    as to what facts the Court has to consider to determine whether

9    or not there is an improper venue in this case?

10         VOICE:  I believe so.

11         MS. SVOBODA:  Where is that?

12         THE COURT:  I don't have something.  This is also -

13   it doesn't seem to be necessarily in dispute.

14         VOICE:  Right.

15         THE COURT:  But I think the parties are going to have

16   to either get together and arrive at a stipulation.  And if you

17   can't arrive at a stipulation, we'll have to have a

18   supplemental hearing.  But I would expect that the parties

19   would have that stipulation of these facts and then make sure

20   that you get everything in it that you need because that's what

21   the Court will use to determine whether or not you have a

22   proper venue here in this matter for this particular - for a

23   particular offense, one or - let's see, we have - we have - we

24   have four counts and so it has to be looked at in that fashion.

25   All right?

PDF created with pdfFactory trial version www.pdffactory.com

1           MR. McGOUGH:  We can certainly do that, Judge.

2           THE COURT:  All right.  And how - I can give you -

3    today being the 20th, I can give you 'til the end of next week

4    --

5           MR. McGOUGH:  Okay.

6           THE COURT: -- so that you can exchange drafts and

7    make any - whatever.

8           So on the 29th.  Is that enough time for you, Mr.

9    McGough?

10          MR. McGOUGH:  Yes, Your Honor.

11          THE COURT:  Miss Svoboda?

12          MS. SVOBODA:  Yes, Your Honor, but could I ask you a

13   question, please?

14          THE COURT:  Surely.

15          MS. SVOBODA:  Judge, right now I'm just looking at -

16   I'm just thinking of the dismissal motion for venue.  The

17   stipulated facts might be different if Miss Penney would decide

18   to cooperate.  Does that matter?  The stipulated facts might be

19   different if Mr. Mass decided to cooperate against Miss Penney.

20          THE COURT:  Well, I guess you have to look at it as

21   of this point in time.  Neither have venue now --

22          MS. SVOBODA:  Okay.

23          THE COURT:  -- because it's at the time - it's at the

24   time the Grand Jury returns the Indictment.  I don't think you

25   can - I don't think you can acquire venue by some - well, maybe

1    you can.  But, I mean, that's sort of a point that should - may

2    be argued.  But I'm looking at the situation at the time of the

3    Indictment in this case whether or not you had proper venue,

4    and I think that's the motion.

5              MR. McGOUGH:  It is.

6              THE COURT:  And it's --

7              MS. SVOBODA:  And that is - yes, Judge.

8              THE COURT:  -- not the motion that something can come

9    up later and there might be venue or might not be venue.

10             MS. SVOBODA:  Okay.

11             THE COURT:  Okay?

12             MS. SVOBODA:  Yes.  Thank you.

13             THE COURT:  All right.

14             And if - at the time the parties wish to - so we'll

15   have two stipulations in a way, the stipulation regarding the

16   motion to dismiss, the stipulation with regarding to the motion

17   to sever.  Following that, those are to be both filed by the

18   29th.  Or a request from either party that they need a

19   supplemental hearing.  If there is a stipulation from both

20   sides, then we can have a supplemental briefing based on those

21   stipulations by August 5th from the defendant in this case and

22   by August 12th from the Government since it's the defendant's

23   motions.  Then you'll have an additional five days in which to

24   amend or - in view of what the stipulation says.

25             As to the motion to suppress, that one will be deemed

PDF created with pdfFactory trial version www.pdffactory.com

1    submitted upon the basis of the - upon the filing of the

2    transcript in these other matters.  But I would be glad to hear

3    you on the - on the motion to suppress if you wish to be heard

4    on the motion to suppress at this time.

5            Mr. McGough.

6            MR. McGOUGH:  Just briefly, Judge.

7            I think first of all there's a - there's a consent

8    problem.  Not only Officer Gassaway indicated that he knew that

9    that was John Mass' living area.  He's been there before,

10   arrested him before.  And not only do they not ask Mr. Mass for

11   permission to search his room, but they also hear - Gassaway

12   hears the objections that Mr. Mass is lodging and doesn't do

13   anything about it, just ignores him.  So I think, number one,

14   there's a problem of even entering the place, the consent to

15   even search for a person.

16           If the Court gets over that first hurdle and we're

17   not conceding it, but if the Court gets over that first hurdle,

18   then I think it becomes a credibility question in light of the

19   exhibits of whether or not a person can really hide underneath

20   that desk.  When pressed, Officer Gassaway said, well, they

21   could be on the other side of it or on the other side of the

22   speakers which is why we asked him the final question:  Does it

23   appear that that make-shift desk is pushed up against the wall?

24   And I think when you look at all of the exhibits and - in

25   combination, there is no area behind the speakers or behind the

PDF created with pdfFactory trial version www.pdffactory.com

1    desk where an individual could have hid.

2              So --

3              THE COURT:  Didn't a chair sort of obscure part of

4    the well of this make-shift desk and isn't it just, you know,

5    that somebody could hide in the well of a desk?  A person could

6    hide in there and even though as we see the clutter in there

7    now, how was a reasonable officer to know that someone couldn't

8    be under that desk?

9              MR. McGOUGH:  From the perspective of where the

10   photograph is taken, I agree, the chair's obstructed and he

11   needs to move the chair in order to get around there.

12             THE COURT:  And once he moves the chair, he saw in

13   plain view, according to the witness and there's no dispute in

14   that, the butt of the gun on this thing laying there in plain

15   view.

16             MR. McGOUGH:  Well, the point I was going to make is

17   from the perspective of the photograph, the chair is in the

18   way, but there's - there's an indication by the officer that

19   hey, when he came downstairs, he cut through the laundry area

20   and he cut through this room and he cut through that room.  So

21   that's only if - if this is the only way to go and this

22   recliner is sitting right there.  So we don't believe that

23   there's sufficient evidence in the record at this point to

24   indicate that that's the only route to take, and he'd have to

25   move the chair in order to see anything if anybody was in that

PDF created with pdfFactory trial version www.pdffactory.com

1    area or not.

2              THE COURT:  Miss Svoboda?

3              MS. SVOBODA:  Stay with that last part first, Judge.

4    As far as Mr. Mass saying there's a credibility problem here,

5    no, the uncontroverted evidence is Officer Gassaway was the one

6    that was in that room exhibited by the photographs.  The room

7    was dark.  He had to use his flashlight.  He bent down because

8    he couldn't see underneath the - well, I was calling it the

9    legroom; I should have called it the well of the desk - and he

10   looked down and he - that's when he saw the gun.

11             He also testified that he himself could fit

12   underneath there.  Obviously, even without maybe these things

13   in them underneath the well - in the well of the desk.  And he

14   said he's had contact with Sarah Penney and that Sarah Penney

15   could fit underneath there.

16             The fact that the desk is pushed up against the wall,

17   that's absolutely irrelevant.  We're talking about the well of

18   the desk.

19             The consent issue:  There is no testimony before this

20   Court that said John Mass objected to the search.

21             MR. McGOUGH:  Miss Svoboda, I find it very difficult

22   to believe that someone sitting out in the car screaming no,

23   don't let them in the house is not an objection to the search.

24   Now, if you can explain to me how that is not an objection to

25   the search, I'll be glad to listen.  But I find that very

1    difficult to believe.

2            MS. SVOBODA:  Those comments were directed to his

3    mother, Mom, don't let them in the house.

4            MR. McGOUGH:  What do you think he was talking about?

5    He was talking about the fact that he did not want the officers

6    to search the premises.

7            MS. SVOBODA:  Then he has to say --

8            MR. McGOUGH:  And he heard and it was said loud

9    enough for everybody in the yard to hear it.

10           MS. SVOBODA:  Then he has to say that.  If he has -

11   if he has a residential interest in that house, then he has to

12   come forward and say no, police, you can't search that.  The

13   evidence before this Court is he said, no, and he said, please,

14   Mom, don't let them in the house.  Even by way of what Officer

15   Gassaway said he understood Mrs. Gibson to say.  I guess he

16   must not want me to let you in.  Then he has to say that.

17   That's exactly what Georgia versus Randolph says.  That's

18   exacting what Hudspeth says.  That's exactly what the Eighth

19   Circuit says in any kind of consent situation.  He needs to

20   come forward and stop it, and he didn't do that.

21           THE COURT:  All right.

22           The matter - that one will be taken under advisement

23   upon the submission of all the other submissions in this

24   matter, so when we're talking about of April - I mean, August

25   12th it will be deemed submitted.

1            MS. SVOBODA:  Okay.

2            THE COURT:  All right.

3            Anything further from the Government?

4            MS. SVOBODA:  No, sir.

5            THE COURT:  By the defendant?

6            MR. McGOUGH:  No, Your Honor.

7            THE COURT:  All right.

8            We'll be in recess.

9            MS. SVOBODA:  Thank you, Judge.

10       (end of proceedings - 10:59 a.m.)

11                      * * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com

1                          TRANSCRIBER'S CERTIFICATE

2

3          I hereby certify that the previous pages reflect truly,

4     accurately and completely the recording of this proceeding as

5     transcribed by me to the best of my ability.

6          In testimony whereof, I have hereunto set my hand this

7     26th day of July, 2011.

8

9                    s/Karen Mason - Transcriptionist

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com

```
1                               I N D E X

2

3                          Direct      Cross      Redirect

4    WITNESSES:

5    FOR THE PLAINTIFF:

6    Wayne M. Lovett            3          11

7    Mary T. Synowiecki        15          31       35/37

8    Jeffrey Gassaway          38        61/75      72/74

9

10

11   MOTIONS:                            Made      Ruled On

12   Motion re Sequestration             3           3

13   Motion to dismiss       Filing No. 42        Pending

14   Motion to sever         Filing No. 44        Pending

15

16

17   EXHIBITS:                         Offered     Ruled On

18   1.   Douglas County Corrections      9           9
          Inmate Handbook
19
     2.   Douglas County Corrections      9           9
20        Clothing Property Receipt

21   3.   Douglas County Corrections      9           9
          Personal Property Receipt
22
     4.   Douglas County Corrections     10          11
23        Phone Sign

24   5.   Photo of basement             57          57

25   6.   Photo of desk                 57          57
```

PDF created with pdfFactory trial version www.pdffactory.com

```
1    7.   Photo of vest with handgun      57          57t
          in holster
2
     8.   Photo of handgun                57          57
3
```